PORTER v. UNITED STATES.

1. Bounty was not allowed by the act of Congress of June 30, 1864, c. 174, where vessels of the enemy were, during the rebellion, destroyed by the combined action of the sea and land forces of the United States.
2. Property seized upon any waters of the United States, other than bays or harbors on the sea-coast, was not maritime prize, nor was any bounty paid by the United States for the destruction thereof.

APPEAL from the Supreme Court of the District of Columbia.

This was · ﹥eeding termed a libel of information filed in the Supreme Court of the District of Columbia, on behalf of David D. Porter and others, officers and men of the North Atlantic Squadron, to recover the bounty provided by the act of Congress of June 30, 1864, c. 174, regulating prize proceedings and the distribution of prize money.

The eleventh se tion of that act declares "that a bounty shall be paid by the United States for each person on board any ship or vessel of war belonging to an enemy at the commencement of an engagement, which shall be sunk or otherwise destroyed in such engagement by any ship or vessel belonging to the United States, or which it may be necessary to destroy in consequence of injuries sustained in action, of one hundred dollars, if the enemy's vessel was of inferior force, and of two hundred dollars, if of equal or superior force, to be divided among the officers and crew in the same manner as prize money; and when the actual number of men on board any such vessel cannot be satisfactorily ascertained, it shall be estimated according to the complement allowed to vessels of its class in the navy of the United States; and there shall be paid as bounty to the captors of any vessel of war captured from an enemy, which they may be instructed to destroy, or which shall be immediately destroyed for the public interest, but not in consequence of injuries received in action, fifty dollars for every person who shall be on board at the time of such capture."

The libel, in substance, alleges that between the 8th of October, 1864, and the 28th of April, 1865, the North Atlantic Squadron, consisting of eleven ships of war—which are men-

tioned — was under the command of David D. Porter, now admiral of the navy; that by orders of the President of the United States and of the Secretary of the Navy he ascended the James and York Rivers, in Virginia, with the vessels composing his squadron, for the purpose of expelling the naval and military forces of the Confederate States from those waters, and to assist in the capture of Richmond; that previously to April 1, 1865, the Confederates, in order to obstruct the passage of the vessels, had erected along those rivers batteries and other means of defence; had caused boats to be sunk in the streams and trees to be filled in and across them; and had placed in the James River, in support of the defences of Richmond, many armed steam batteries, steam rams, iron-clad ships of war, and armed steamers, of which eleven are mentioned by name; that the fleet removed the obstructions from the river, attacked the naval forces of the Confederates, destroyed some of the vessels, and caused the enemy to destroy others to prevent them from falling into the possession of the United States, and that nine vessels, which are named, were thus destroyed.

The libel further alleges that the vessels of the enemy, aided by the guns of the batteries and the obstructions in the river, constituted a superior force to that under the command of Admiral Porter; and claims that by the act of Congress, cited above, the officers and men of the squadron were entitled to a bounty of $200 a head for each man on the enemy's vessels at the commencement of the engagement. It therefore prays that such bounty may be allowed to them; and that in estimating the numerical strength of the enemy, the court will take into consideration and adjudge that all persons engaged on land, as well as those on the water, in resisting the United States naval forces in that engagement, may be held to have been on board of the enemy's vessels, and treated as adjuncts to them; and, furthermore, as it will be difficult, and in some instances impossible, by reason of the lapse of time and from other causes, to show the number of men that were on and about the enemy's vessels when the engagement commenced, the libel prays that such forces may be estimated according to the complement of men allowed to vessels of the same capacity in the navy of the United States.

Upon this libel process was ordered to be issued to the Secretary of the Navy, notifying him of the commencement of the suit; and subsequently testimony in the case was taken, and such proceedings were had as resulted in a decree in favor of the libellants, by the Supreme Court of the District of Columbia, sitting in admiralty, and held by a single justice. The case being subsequently carried before the full court, the decree was reversed and the libel dismissed.

From the decree of dismissal the case was brought by appeal to this court.

*Mr. Jerome F. Manning* for the appellants.
*The Solicitor-General, contra.*

MR. JUSTICE FIELD delivered the opinion of the court, and, after stating the case as above, proceeded as follows : —

Two objections are made to the recovery of the bounty claimed by the libellants : one, that the destruction of the Confederate vessels was effected by the joint action of the army and navy; the other, that it took place on the inland waters of the United States.

For the determination of the first of these objections, it will be necessary to consider the movements of the fleet under command of Admiral Porter, immediately preceding the capture of Richmond. The record enables us to do this, although officers present on the vessels differ in their recollection of dates.

On the morning of April 2, 1865, General Lee, commanding the enemy's forces around Richmond, informed the Confederate authorities that he should immediately withdraw his lines and evacuate the city. The withdrawal and evacuation took place on the evening of that day. Information of his purpose was undoubtedly communicated to Admiral Porter soon after it was generally known in Richmond, which was before noon. At that time there were in James River, for some miles below Richmond, obstructions which the Confederates had placed to prevent the ascent of the Union fleet. Vessels filled with stone had been sunk, and numerous torpedoes planted in the stream. Batteries had also been erected along the river. Some of the obstructions were just above the lower end of what was known as Dutch Gap Canal, about sixteen miles by the river from

Richmond, which were originally placed there by the Confederates, and afterwards maintained by the forces of the United States. Two miles above them was Howlett's Confederate battery. Eight miles above the Dutch Gap Canal was Chaffin's Bluff; and one mile above that on the opposite side of the river was Drury's Bluff, seven miles below Richmond. General Lee's lines extended across the river between the two bluffs, and below them. Above the obstructions near Dutch Gap Canal several Confederate vessels of war were stationed. When General Lee was compelled to abandon his lines, orders were given that the batteries on James River should be withdrawn, and the Confederate vessels destroyed.

As soon as Admiral Porter, on the 2d of April, was informed, or had reason to believe, that General Lee intended to retreat from Richmond, he gave orders for the removal of the obstructions in the river, and for his vessels to open fire on the Confederate batteries within range, and to push on through the obstructions as fast as they were carried away, first sending boats ahead to remove the torpedoes. These orders were carried out with great gallantry and spirit; a heavy fire was opened on the batteries, and during the following night a channel was cut through the obstructions. Soon after the fleet opened fire, the enemy, to prevent the capture of his vessels, commenced destroying them, — setting fire to some of them, and blowing up others. On the next day, the 3d, the fleet passed through the obstructions, and moved up to Drury's Bluff, capturing one of the enemy's vessels which had not been destroyed, — the iron-clad ram "Texas." Another of the enemy's vessels, the "Beaufort," was subsequently captured further up the river. At Drury's Bluff the vessels were detained by the obstructions until the 4th. On that day the Admiral, accompanied by President Lincoln, proceeded up to Richmond.

Although, in the movements of the Admiral's fleet in its ascent of James River and in its attack on the batteries, he was not assisted by the actual presence of any portion of the army of the United States, so that the capture of the two vessels — the "Texas" and the "Beaufort" — and the destruction of the other vessels, may, in that sense, be said to have been effected by his fleet alone, yet, without the aid of the army the

result mentioned would not probably have been accomplished. Certainly, its movements contributed most essentially to the success of the fleet. For several months it had been lying near Richmond under the command of General Grant, with the avowed purpose of capturing that city, and of destroying the Confederate forces. The result of the battle of Five Forks, on the 1st of April, satisfied the Confederate commander that he could not hold his lines and protect Richmond. The withdrawal of his troops and the evacuation of Richmond followed. Had they not been thus forced to retire, and his lines had continued to cross James River between Chaffin's Bluff and Drury's Bluff, it would have been almost, if not quite, impossible for the fleet of Admiral Porter to ascend the river. The fire of the shore batteries, with the assistance of the Confederate troops near by, would have checked any advance, supported, as they would have been, by the Confederate vessels and the torpedoes in the stream. It is plain, therefore, that whatever was accomplished by the fleet of the Admiral in James River, on the second and third days of April, 1865, must be considered as the result of the co-operative action of both the army and the navy. It matters not that the movements of the army were miles distant from the operations of the fleet. They relieved that fleet from resistance which might and probably would have defeated any attempt to ascend the river above the shore batteries and destroy the armed vessels of the enemy.

Prize money, or bounty in lieu of it, is not allowed by the laws of Congress where vessels of the enemy are captured or destroyed by the navy with the co-operation of the army. To win either, the navy must achieve its success without the direct aid of the army, by maritime force only. No pecuniary reward is conferred for anything taken or destroyed by the navy when it acts in conjunction with the army in the capture of a fortified position of the enemy, though the meritorious services and gallant conduct of its officers and men may justly entitle them to honorable mention in the history of the country. *The Siren*, 13 Wall. 389.

The second objection to a recovery, that the destruction of the Confederate vessels was effected upon inland waters of the United States, is equally clear, if the term " property," used in

the seventh section of the act of July 2, 1864, c. 225, can be cons'rued — as counsel seem to take for granted — to embrace public vessels of the enemy. That act provides, among other things, for the collection of captured and abandoned property, and is in addition to the act on that subject of March 12, 1863, c. 120. The seventh section declares: "That no property seized or taken upon any of the inland waters of the United States by the naval forces thereof, shall be regarded as maritime prize; but all property so seized or taken shall be promptly delivered to the proper officers of the courts, or as provided in this act and in the said act approved March twelve, eighteen hundred and sixty-three."

The term "inland" as here used was evidently intended to apply to all waters of the United States upon which a naval force could go, other than bays and harbors on the sea-coast. In most instances property of the enemy on them could be taken, if at all, by an armed force without the aid of vessels of war. These were seldom required on such waters, except when batteries or fortified places near them were to be attacked in conjunction with the army. As observed by the court in *The Cotton Plant*, Congress probably anticipated, in view of the state of the war when the act was passed, that most of the captures on the rivers would be made by the army. 10 Wall. 577.

James River is an inland water in any sense which can be given to the term "inland." It lies within the body of counties in Virginia. For miles below Richmond, and below the obstructions mentioned, a person can see from one of its banks what is done on the other. Rivers across which one can thus see are inland waters. It matters not that the tide may ebb and flow for miles above their mouths; that fact does not make them any part of the sea or bay into which they may flow, though they may be arms of both. *United States* v. *Grush*, 5 Mason, 290.

*Decree affirmed.*