# THE NUESTRA SEÑORA DE. REGLA.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR
THE SOUTHERN DISTRICT OF NEW YORK.

*Appeal—Constitutional Law—Demurrage—Execution—Prize—Probable
Cause—Supreme Court.*

The *Nuestra Señora de Regla* was seized in November, 1861, by the army. In
December, 1861, the master chartered her to the quartermaster's depart-
ment for two hundred dollars a day. She remained in the service of the
quartermaster till January 29th, 1862, when she was delivered to the navy,·
by whom she was used as a transport till March 1, 1862. She was then
sent to New York and libelled as prize. A decree of restitution was made
June 20th, 1863. Proceedings to fix the amount of demurrage were stayed
to enable the matter to be adjusted diplomatically. In 1870 the Depart-
ment of State informed the Spanish Minister that it would be more satis-
factory to the United States to have the question settled by the court. A
reference to a commissioner resulted in a decree for demurrage to the date
of the decree for restoration, in all 268 days. On appeal the decree was set
aside as excessive, and the case remanded. Under a new reference the
same demurrage was allowed, and decree therefor made: *Held* that
1. It having been settled by the former decree in 17 Wall. 29, that the steamer
   was not lawful prize, and that the capture was without probable cause,
   these questions were no longer open. *Supervisors* v. *Kennicott*, 94 U. S.
   498, followed.
2. The capture being made by the army, the vessel was not subject to condem-
   nation as prize.
3. The executive could, without legislative authority, submit to the determina-
   tion of a judicial tribunal the question of the amount of damages for the
   capture.
4. A captor who does not institute judicial proceedings for the condemnation
   of his prize without unnecessary delay is subject to demurrage in case a
   decree of restitution is made after proceedings are begun.
5. The United States are liable to demurrage in the present case from the date
   when the surrender for adjudication might have been made until the date
   of the surrender, at the rate fixed by the charter party.

The steamer Nuestra Señora de Regla was built in New
York for the claimant, a railroad company in Cuba, created by
the laws of Spain. She was delivered to an agent of the claim-
ant on the 6th of November, 1861, and sailed for Havana in
command of a Spanish master. She was a side-wheel steamer
of about three hundred tons burden, built to run on a ferry

Statement of Facts.

between Havana and a terminus of the railroad company's railroad, On her way down the coast she went into Port Royal, and while there the quarter-master of the United States. at that post offered to purchase her for the use of the government. The master declined to sell, as he had no authority. She was then, on the 29th of November, seized by order of. Gen. Thomas W. Sherman, in command of the United States forces. In communicating the fact of the seizure to the adjutant-general of the army, on the second of December, the general said :

"If this steamer I have seized is confiscated, she should be left here. She is just the thing we want, and admirably adapted for these waters and our purpose. She is new and exactly such a boat as they have at the Jersey City Ferry in N. Y. . Will cary 1,000 men, and will draw not over six or seven feet."

No judicial proceedings were instituted for her condemnation, but at some time before December 16th, the following charter-party was entered into :

"Articles of agreement made this       day of December, 1861, between                , captain of the steam ferry-boat Nuestra Señora de Regla, for and on behalf of the owners of the said ferry-boat, of the first part, and Captain Rufus Saxton, as assistant quarter-master in the United States army, for and on behalf of the United States of America, of the second part, witnesseth :

"That the said party of the first part, for and in consideration of the payment hereinafter promised to be well and truly made by the said party of the second part, hath chartered to the United States the steam ferry-boat Neustra Señora de Regla, with all her tackle, apparel, furniture, and machinery, to be used for transporting troops, stores, or other things, as the said party of the second part may direct.

"And the said party of the second part doth agree, for and in consideration of the faithful performance of the above duty, that the said party of the first part shall receive the sum of two hundred dollars for each and every day the said boat may be kept in service, said steam ferry-boat to be kept staunch, sound and strong,

and her machinery in good running order and condition, by the party of the first part.

"It is understood by the parties to this agreement that in case the said steam ferry-boat shall be confiscated to the United States, then this contract shall be void; otherwise to remain in full force and virtue.

"It is furthermore understood by the parties to this agreement that the said steam ferry-boat is not to be run outside of the bar of Port Royal, but at any and all points on the rivers and creeks that connect with Broad River.

"This contract to commence on the 16th day of December, 1861, and continue in force ten days, after which each party has a right to cancel the same.

"In witness whereof the undersigned have hereunto affixed their hands and seals, at Hilton Head, S. C., the day and date first above written.

"(S'd)       YGNACIO A. REYNALS.       [L. S.]
"(S'd)       R. SAXTON,       [L. S.]
"Capt. U. S. Army, Chief Quartermaster, E. C."

The testimony showed that two hundred dollars a day was a fair price for the use of the vessel at that place at that time. One witness, competent to judge, testified to that effect, and no attempt was made by the United States to contradict him.

The vessel was kept in the possession or under the control of the quarter-master until the 29th of January, when she was in form delivered to the flag officer of the navy in command at that station. She was, however, kept in constant use by the government as a transport, in the way contemplated by the charter, from the 16th of December until about the 1st of March, when she was sent to New York. No judicial proceedings were begun against her until the 9th of June, when a libel of information in prize was filed in the District Court for the Southern District of New York by the United States, in behalf of themselves "and of the naval captors in interest." She was attached on the same day by the marshal, and the usual monition was issued and served. The owner filed a claim on the 9th of July. No further proceedings were had until the 22d of August, when the following order was entered:

" On reading and filing a notice of motion and a verified copy of a letter from the secretary of the navy, stating that the navy department desires to obtain possession of the steamer Nuestra Señora de Regla ; and on hearing Mr. E. Delafield Smith, United States district attorney, in support of the motion, and Mr. W. R. Beebe, proctor for the claimants, in opposition thereto, it is hereby ordered that the said steamer Nuestra Señora de Regla be appraised by Benjamin F. Delano, United States naval constructor, and Benjamin F. Garvin, chief engineer, both now stationed at the navy yard, New York, and John Inglis ; that such appraisement be filed with all convenient speed with the clerk of this court ; that thereafter said steamer be delivered to the navy department for the use of the government, upon filing in court a certificate of the assistant treasurer of the United States in New York that the amount of the appraisement has been deposited in the United States treasury, subject to the order and disposal of the court on final decree in the case.

" SAMUEL R. BETTS."

The letter of the secretary of the navy referred to in this order was as follows :

" NAVY DEPARTMENT, *August 11th*, 1862.

" SIR: The department will take the steamer Nuestra Señora de Regla at the appraisement of twenty-five thousand dollars.

" It desires early information, if practicable, as to the appraisement in the case of the Annie, the Stettin, and the Memphis.

" I am, resp'y, your ob't s'v't,      " GIDEON WELLS."

The vessel was valued by two of the appraisers at $28,000 and by the third at $30,000, and immediately delivered to the navy department, although the certificate of deposit provided for was never filed.  The cause was heard on the 20th June, 1863, and a decree entered directing that the vessel be restored to the owner, but reserving all questions of costs, and damages resulting from the capture, for future hearing and determination.  On the 15th of October, 1863, the following entry was made in the cause :

" It having been mutually agreed between the counsel for the

respective parties that the said vessel, in the above decision, was immediately taken into the possession and use of the United States under a charter-party, and delivered them thereunder, and, so remained without molestation from the claimants. On motion of the counsel for the vessel and with the assent of the United States attorney, it is ordered by the court that further proceedings and litigation be stayed in the above cause, to the end that all questions of damages reserved in the decision of the court in the term of June last, may be considered and adjusted by the government of the United States in the application, and with the concurrence of the government of Spain.

"SAMUEL R. BETTS."

On the 20th of May, 1870, the following letter was addressed to the Spanish minister in Washington by the Acting Secretary of State:

"DEPARTMENT OF STATE, *Washington, May* 20*th*, 1870.

"SIR: I have the honor to acknowledge the receipt of your note of the 5th instant in relation to the Spanish steamer Nuestra Señora de Regla, and the claim which arose in consequence of her seizure by the United States authorities in 1861.

"The District Court of the United States for the Southern District of New York, after deciding that the claimants were entitled to restitution of the vessel, made an order suspending proceedings, to the end that the question of damages might be considered and adjusted by the government on the application and with the concurrence of that of Spain.

"Without referring to the reasons which have so long delayed any arrangement between the two governments, I have now to say that it will be more satisfactory to the government that the parties interested should apply to the court, which still retains jurisdiction of the case, to obtain such further relief as justice may demand, and in the mode which that tribunal shall deem most proper and convenient.

"I avail myself of this occasion to offer to you assurances of my very high consideration.

"J. C. BANCROFT DAVIS,
    *Acting Secretary of State.*"

On the 2d of June following, the cause was referred to one of the commissioners of the court to ascertain the amount of damages the claimant had sustained by the seizure and detention of the vessel. The commissioner made his report on the 20th of May, 1871, fixing the damages for the detention at the rate of $200 a day from November 29th, 1861, to June 20th, 1863, the date of the decree for restoration, with interest at six per cent. per annum, amounting to $167,370.66⅔, and allowing for the expenses and services of an agent remaining with and attending to the vessel, $5,680; for counsel fee in defending the proceedings, $5,000, and for the value of the vessel at the date she should have been restored, with interest added, $36,833.33⅓, or a total of $214,884.00. Exceptions were taken to this report by the United States, but they were overruled, and a decree rendered for the full amount allowed by the master, with interest added.

From that decree an appeal was taken to this court, where, at the October term, 1872, it was decided "that the vessel was not lawful prize of war or subject to capture, and the corporation which owned her is doubtless entitled to fair indemnity for the losses sustained by the seizure and employment of the vessel; but it may be well doubted whether it is not more properly a subject of diplomatic adjustment than determination by the courts." It was also said in the opinion, "the decree of the district court included the sum of $5,000 for counsel fees. We think that the amount was greatly excessive, and the allowance for counsel fees wholly unwarranted." For the errors thus indicated the decree was reversed. *The Neustra Señora de Regla*, 17 Wall. 29. The case was then remanded for further proceedings in accordance with the opinion. On the 22d of July, 1873, after the mandate was filed, a second reference was made to the commissioner "to assess the damages of the claimant of the vessel sustained by him in consequence of the seizure and detention of the vessel, and that on such reference all the proofs already taken in the cause or before the referee be used, together with such other proofs as may be put in by either party."

Under this reference the commissioner again reported that the United States continued to use the vessel after she was taken

possession of by the navy department, pursuant to the order of August 22d, 1862, until the 20th of June, 1863, the date of the decree for her restoration, and that she had never been restored to the owners or her value paid. He therefore allowed:

For detention from November 29th, 1861, to June
   20th, 1863, 568 days, at $200 per day ......... $113,600 00
         Interest at 6 per cent. to date of report ...   81,698 00
For value of vessel, ascertained to be ...........   30,000 00
         Interest from June 20th, 1863 .............   21,549 00
For expenses of agent, 568 days at $10 .........    5,680 00

                                     $252,527 00

To this report exceptions were filed on behalf of the United States, but they were overruled by the court, and a decree entered March 8th, 1879, for the amount found due, with interest from the date of the report, or in all, $308,932.38. From that decree this appeal was taken.

*Mr. Assistant Attorney-General Maury* for the United States:—I. Argued the merits of the seizure on the facts as now presented, and contended, on the authority of *United States* v. *Bank of the United States*, 5 How. 382, that the court was not concluded in the second appeal by an expression of opinion on the first appeal as to a question which was not then presented in the then condition of the record; and further that the government cannot be prejudiced by the laches of its officers in omitting to properly present the question of the validity of the seizure at the former trial.—II. The record shows the seizure was made for probable cause, as defined in *The Thompson*, 3 Wall. 155; *Locke* v. *United States*, 7 Cranch, 339. —III. The proper parties to a judgment are not before the court. The persons who used the authority of the government to seize the vessel should be here in a proceeding in prize. *The Louisa Agnes*, Blatchford Prize Cases, 107; *The Eleanor*, 2 Wheat. 345; *The Magnus*, 1 C. Rob. 31. Especially if a judgment for costs is to be given against them. *The Leucade*,

2 Spinks. 228. The soldiers who made the seizure have no interest in the prize as captors, *The Siren*, 13 Wall. 389; but may nevertheless be subjected in a prize court to damages and costs for the seizure. *Ib.*—IV. The court below was without authority to make a decree against the United States. *Case* v. *Terrell*, 11 Wall. 199.—V. The demurrage was not referrible to the capture as proximate cause, and was therefore not ground for damages in this suit.—VI. The use of the vessel under the charter-party was under a contract, and therefore not a ground for judgment for damages.—VII. No damages should in any event have been allowed after August, 1862.

*Mr. William Allen Butler* for the appellee.—I. The questions settled at the former hearing are no longer open *Himely* v. *Rose*, 5 Cranch, 313; *Skillern* v. *May*, 6 Cranch, 267; *Ex parte Silbald* v. *United States*, 12 Pet. 488; *The Santa Maria*, 10 Wheat. 431; *Corning* v. *Troy Iron and Nail Factory*, 15 How. 451; *Supervisors* v. *Kennicott*, 94 U. S. 498; *The Lady Pike*, 96 U. S. 461.—II. The district court had power to make all orders and decrees made in the case. *The Apollon*, 9 Wheat. 362; *The Lively*, 1 Gallison, 314; *The Glen*, Blatchford Prize Cases, 375; *The Sybil*, Blatchford Prize Cases, 615; *The Siren*, 7 Wall. 152; *The Labuan*, Blatchford Prize Cases, 165; *The Jane Campbell*, Blatchford Prize Cases 101.—III. The United States having waived objection to jurisdiction, the adjudication is final. The exercise of a jurisdiction which exists cannot be objected to after voluntary appearance and litigation on the merits. *Rhode Island* v. *Massachusetts*, 12 Pet. 657; *Bangs* v. *Duckinfield*, 18 N. Y. 592. A State properly brought into the forum of litigation cannot assert rights or immunities as incident to sovereignty. *Davis* v. *Gray*, 16 Wall. 203.—IV. The United States is not sued in these proceedings. It comes into court voluntarily, and forces the vessel here. That has no analogy to a proceeding against the United States as defendants. There are plenty of precedents to support the decree. *The Labuan* and *The Sybil*, *ubi. sup.*—V. There was no error in respect to the award of damages. On this point *Mr. Butler* referred to the Treaty of 1795, 8

Stat. 139, as showing the obligation and rights of the parties, and cited Roberts on Admiralty and Prize, 446; Upton on Prize Courts, 246; Phill. Int. Law, § 449; *The Lively*, 1 Gallis. 314; *The Apollon*, 9 Wheat. 377; *The Pizarro*, 2 Wheat. 227; Massé, Droit Commercial, liv. ii., ch. 2 § 2; § xi. tom. 1, p. 310; 3 Phill. Int. Law, 41; Wheat. Int. Law (Lawrence ed.), 512; *Haver v. Yaker*, 9 Wall. 32. The rule of damages is to measure the compensation by the freight which the vessel was in the act of earning. *Williamson v. Barrett*, 13 How. 101; *The Gazelle*, 2 W. Rob. 279; *The Glaucus*, 1 Lowell, 366; *Vantine v. The Lake*, 2 Wall. Jr. 52; *The Narragansett*, Olcott, 388; *The Rhode Island*, Olcott, 505; *The M. M. Caleb*, 10 Blatchford, 467; *The Stromless*, 1 Lowell, 153; *Whitehall Trans. Co. v. N. J. Steamboat Co.*, 51 N. Y. 369; *Mailler v. Express Propeller Line*, 61 N. Y. 312. Under the circumstances complete indemnity can be given only by compensation for the loss of earnings as well as the loss of the vessel. *Allen v. Fox*, 51 N. Y. 562; *Star of India*, 1 Prob. Div. 466; *Dermott v. Jones*, 2 Wall. 1; *Sturgis v. N. J. Steamboat Co.*, 35 N. Y. Superior Ct. Rep. 251; *S. C.* on appeal, 62 N. Y. 625; *Howland v. Coffin*, 47 Barb. 653. For the parallel rule at common law, see *Hadley v. Baxendale*, 9 Exch. 341; *Phil., Wilm. & Balt. R. R. Co. v. Howard*, 13 How. 307. And the order of the prize court of Aug. 22d, 1862, for the delivery of the vessel to the navy department, does not affect the right of the claimant to the whole award for demurrage up to the time of final decree. *The Memphis*, Blatchford, Prize Cases, 202; *The Ella Warley*, Ib. 207; *Hudson v. Guestier*, 4 Cranch, 293; *Home v. Camden*, 2 H. Bl. 532, and 4 T. R. 383; *Willis v. Commissioners of Prize*, 5 East, 22; *The Noysomhed*, 7 Ves. Jr. 593; *The Brig Louis*, 5 C. Rob. 146; *The Two Friends*, 1 C. Rob. 271; *The Eliza*, 1 Acton, 336; *Smart v. Wolffe*, 3 T. R. 323; *The Pomona*, 1 Dodson, 25; *The Peterhoff*, Blatchf. Prize Case, 620; *Le Caux v. Eden*, 2 Doug. 594, 610, 616; *Goss v. Withers*, 2 Burr. 683, 694; *The Flad Oyem*, 1 C. Rob. 134; *The Santa Cruz*, 1 C. Rob. 49; *The Fanny and Elmira*, 1 Edw. Adm. 117; *The Ceylon*, 1 Dodson, 105.

Mr. Chief Justice Waite delivered the opinion of the court. After reciting the facts as above stated he continued :

That the steamer was not lawful prize or the subject of capture was expressly decided on the former appeal. It was also impliedly settled that the capture was without probable cause, for it was said that the owner was undoubtedly entitled to a fair indemnity for the losses sustained, the only difficulty being as to the amount. These questions are, therefore, no longer open. *Clark* v. *Keith*, 106 U. S. 464; *Supervisors* v. *Kennicott*, 94 U. S. 499.

The first of the remaining questions to be considered is whether a decree can be entered against the United States for damages. As the capture was made by the army, or by the army and navy operating together, it inured exclusively to the benefit of the United States. There is no distribution of prize money in such a case. *Porter* v. *United States*, 106 U. S. 607; *The Siren*, 13 Wall. 389. The United States were, therefore, in legal effect the captors, and they came voluntarily into court to secure for themselves the benefit of what had been done. They deliberately adopted the acts of the military and naval officers as their own, and came, as captors, to condemn their prize. Offers to purchase the vessel were made and declined before she was seized, and soon after the seizure she was chartered and put into actual use without any attempt at securing an adjudication. It is evident, also, that the capture must have been the subject of diplomatic correspondence between the government of Spain and the United States before the vessel was brought in for adjudication, because on the 6th of May, 1862, after the vessel got to New York, and before the libel was filed, Mr. Seward, the then secretary of State, wrote the district attorney for the Southern District of New York, as follows :

" Sir : Noticing the arrival at New York of the Spanish steamer Nuestra Señora de la Regla, which was seized at Port Royal by General Sherman for an alleged illegal breach of neutrality, I now transmit the papers found on board of her, and an abstract of them which I caused to be prepared and which you may find useful."

Although the libel was filed on the 9th of June, 1862, and the claim was promptly put in, the adjudication was not had until June of the following year, when all further proceedings were stayed with the consent of both parties to await an adjustment of damages by the two governments. Nothing further was done until nearly seven years afterwards, when the secretary of State informed the Spanish government of the wish of the United States that the parties interested should apply to the court, which still retained jurisdiction, for such relief as justice demanded, and in the mode that tribunal should deem most proper and convenient. Thereupon, on motion of the claimant, and with the consent of the United States district attorney, the reference was ordered to ascertain the damages. Under these circumstances we cannot but think the United States have voluntarily submitted themselves to the court at the instance of the Spanish government, and with the consent of the claimant, for the purpose of having the questions of damages growing out of the capture judicially settled according to the rules applicable to private persons in like cases.

It is objected, however, that the executive department of the government had no power, in the absence of express legislative authority, to make such a submission. It was the duty of the United States, under the law of nations, to bring all captured vessels into a prize court for adjudication. If that had not been done in this instance, the Spanish government would have had just cause of complaint, and could have demanded reparation for the wrongs that had been done one of its subjects. The executive department had the right to bring the suit. In that suit it had been determined that the capture was unlawful. Necessarily, therefore, the question of damages to the owner of the captured vessel arose. Since, without the consent of the United States, no judgment for damages could be rendered against them in the pending suit that could be enforced by execution, the Spanish government had the right to assume the prosecution of the claim, and it did. Necessarily the negotiations on the part of the United States under this claim were conducted by the executive. After long delay no agreement was reached, and as a last resort for ending the controversy, it

was determined to refer the whole matter to the court for judicial inquiry and determination. We see no reason why this might not be done in such a case. It is true any judgment that may be rendered cannot be judicially enforced, but the questions to be settled are judicial in their character, and are incidents to the suit which the United States were required to bring to enforce their rights as captors. It is too late now to insist that the case is not one of prize, because in the libel it is expressly alleged that the vessel was captured as lawful prize, and condemnation was asked on that account. When, therefore, the United States, through the executive of the nation, waived their right to exemption from suit, and asked the prize court to complete the adjudication of a cause which was rightfully begun in that jurisdiction, we think the government is bound by the submission, and that it is the duty of the court to proceed to the final determination of all the questions legitimately involved.

The next inquiry is as to the amount of damages. The duty of a captor is to institute judicial proceedings for the condemnation of his prize without unnecessary delay, and if he fails in this the court may, in case of restitution, decree demurrage against him as damages. This rule is well settled. *Slocum* v. *Mayberry*, 2 Wheat. 1; *The Apollon*, 9 Wheat. 362; *The Lively*, 1 Gall. 314; *The Corier Maritimo*, 1 Rob. 287.

Upon the facts in this case there can be no doubt of the propriety of such an allowance for the extraordinary detention of the vessel before she was delivered up for adjudication, especially since she was detained for the express purpose of use by the United States. And as to the amount of the allowance, there is no opportunity for discussion. The United States were willing and actually contracted to pay $200 a day for her use if she was not in fact lawful prize, and that is shown to have been a reasonable price for her charter at the time. She was seized on the 29th of November, and it is fair to assume that if due diligence had been used she might have been surrendered for adjudication by the 16th of December, when her charter began to run. She was not actually surrendered until the 9th of June—a delay of 175 days beyond what was necessary. It

is not disputed that her value at that time was $30,000. She cost when built $50,000, and was new when captured. As she has never been restored under the order to that effect, there can be no doubt of the liability of the United States for her value, when at their request she was delivered into their possession by the court. It is not a matter of any importance that the certificate of deposit in the treasury of the amount of her appraised value was not filed. By taking the vessel on the terms imposed by the court, the United States impliedly agreed to restore her in as good condition as she was when taken, or pay her value in money. By the surrender of the vessel for adjudication, the United States relieved themselves from any further liability for damages in the way of demurrage, and became bound for the vessel instead.

The allowance for demurrage includes reasonable compensation for the pay and expenses of an agent to look after the interests of the owners up to the time of the delivery of the vessel to the navy department by the court. After that no agent was necessary. From that time the case stood as though a sale had been made and the proceeds paid into the registry of the court.

Our conclusion is that damages should be allowed as follows:

For unnecessary and unusual delay in proceeding to
    adjudication, 175 days at $200................ $35,000
For value of vessel.............................. 30,000

    In all .................................. $65,000

To which add interest, at the rate of six per cent. per annum, from the time of the order of restitution, June 20th, 1863, until the decree.

*The decree of the district court is reversed and the cause remanded with instructions to enter another decree in accordance with this opinion.*