OPINION.
Drake, Ch. J.,
delivered the opinion of the court:
On the 11th of August, 1866, the President of the United States proclaimed a treaty which" had been entered into between the United States and The Cherokee Nation of Indians (14 Stat. L., 799), the tenth article of which was in these words:
Every Cherokee and freed person resident in the Cherokee Nation shall have the right to sell any products of his farm, including his or her live stock, or any merchandise or manufactured products, and to ship and drive the same to market without restraint, paying any tax which is now or may he levied hy the United States on any quantity sold outside of the •Indian Territory.
In the year 1867 the claimant was the proprietor of a tobacco factory in the Indian Territory, which was enlarged in the following year, and the same was in operation in the years 1867,1868, and up to the 22d of December, 1869.
*726 By section 107 of the Act of July 20, 1868, “imposing taxes on distilled spirits and tobacco, and for other purposes” (15 Stat. L., 125, 167, ch. 186), it was enacted—
That the internal-revenue laws imposing taxes on distilled spirits, fermented liquors, tobacco, snuff, and cigars, shall he held and construed to extend to such articles produced anywhere within the exterior boundaries of the United States, whether the same shall he within a collection district or not.
It was in virtue of this provision that, on the 22d of December, 1869, the claimant’s factory, notwithstanding the above treaty stipulation, was seized for a violation of the internal-revenue laws in selling manufactured tobacco in the Indian Territory without the internal-revenue tax having been paid on it.
The property seized was libeled in the United States district court for the western district of Arkansas, where the claimant appeared and claimed it, insistin g that the Act of July 20,1868, did not repeal or abrogate the treaty stipulation, nor take away from the Cherokee people any of the rights or privileges secured to them by that stipulation.
At the trial of the case the district court refused to sustain this position; a verdict was rendered by a jury in favor of the United States, and the property seized was condemned by a decree of the court as forfeited, May 16, 1870.
The case was taken by writ of error to the Supreme Court of the United States, where, after argument by able and eminent counsel for claimant, and by both the Attorney-General and the Solicitor-General for the Government, in which, the court said, “ a remarkable wealth of learning and ability had been expended in the discussion,” the decree of the district court was affirmed, May 1,1871.
Mr. Justice Swayne, in delivering the opinion of the court, said:
We are glad to know that there is no ground for .any imputation upon the integrity or good faith of the claimants who prosecuted this writ or error. In a case not free from doubt and difficulty, they acted under a misapprehension of their legal rights. * * * If a wrong has been done, the power of redress is with Congress, not with the judiciary, and that body, upon being applied to, it is to be presumed, will promptly give the proper relief.
Sustained by this indorsement of that august tribunal the claimant, on the 12th of November, 1877, petitioned Congress *727 for relief, setting up in bi§ petition claims aggregating more than $96,000. Congress on the 4th of June, 1880 (21 Stat. L., 544, ch. 123), passed the following act:
AN ACT to permit Elias C. Boudinot, of the Cherokee Nation, to sue in the Conrt of Claims.
Whereas the United States by the enactment of the one hundred and seventh section of the act of Congress.approved the twentieth day of July, anno Domini eighteen hundred and sixty-'eight, superseded the tenth section of the treaty entered into by and between the United States and the Cherokee Nation on the nineteenth day of July, anno Domini eighteen hundred and sixty-six; and
Whereas the property of Elias C. Boudinot, a Cherokee Indian, was seized and disposed of by the authorities of the United States in consequence of the enactment of said one hundred and seventh section, although the Supreme Court of the United States in its opinion expressed in the ease prosecuted by said Elias C. Boudinot to test the constitutionality of said one hundred and seventh section and the validity of the said seizure and disposition of his property, and reported in eleventh Wallace, United States Supreme Court Reports, page six hundred and sixteen, entitled “ The Cherokee Tobacco',” declared * that there was no ground for any imputation upon the integrity or good faith of” him, the said Elias C. Boudinot; and, further, that it is to be presumed that if a wrong has been done to him, the said Elias C. Boudinot, the Congress of the United States will promptly give the proper relief if applied to by the said Elias C. Boudinot; and
Whereas the Supreme Court of the United States was not called upon to decide, and did not decide, whether the exeerrtive officers of the United States had taken the necessary steps to make operative said one hundred and seventh section in said Cherokee Nation anterior to said seizure of the property of said Elias C. Boudinot; and
Whereas there is grave doubt that such steps were taken, and it manifestly appears that a wrong has been done to said Elias C. Boudinot, in consequence of the casual infraction of the said treaty, which should be repaired by appropriate satisfaction in maintenance of said treaty, which still subsists; Now, therefore,
Be it enacted by the Senate and Souse of Bepresentatives of the United States of America in Congress assembled, That in order to give Elias C. Boudinot, of the Cherokee Nation, the proper relief for the wrong done him by reason of said seizure and disposition of his property, he, the said Elias C. Boudinot, be, and he is hereby, authorized to bring suit in the Court of Claims against the United States Government, to recover what may be due to him in justice and equity for the loss inflicted upon him by reason of said seizure for an alleged violation of the internal-revenue laws, of his property, a tobacco factory, its detention, and dama'ge thereto whilst under seizure, the value of the tobacco, material, and other personal property also seized, and the expenses to which he was subjected thereby.
Approved, June 4, 1880.
*728 Under this act tlie claimant, on the 17th of June, 1880, filed his petition in this court, asking judgment for $98,050,* and on the 8th of February, 1883, he filed an amended petition praying judgment for $175,000. The claim presented to us is, therefore, one of unusual magnitude, and, in some of its aspects, of more than ordinary importance.
In no instance, probably, in the history of this court has a special act authorizing a party to sue the United States here been couched in terms so liberal to the claimant as those of this statute.
It removes any ground for questioning the right of an Indian to sue in this court, and gives jurisdiction to this tribunal, which it would not otherwise have, of a claim against the Government based on an alleged tort committed by its officers.
It goes further, and declares an act done by the internal revenue officers of the Government, which had been sustained by the verdict of a jury and the decree of a United States district court, affirmed by a solemn judgment of the Supreme Court of the United States on a grave constitutional question, to have been “ a wrong done” to the claimant.
And it goes still further, and authorizes the claimant “tore-cover what may be due him injustice and equity, for the loss inflicted upon him” by the seizure of his property, though the perfect legality of the seizure was sustained by the judiciary appointed under the Constitution and laws to decide the matter of controversy involved in that proceeding.
There seems, therefore, nothing for this court to do in the case but merely assess the amount due the claimant “in justice and equity for the loss inflicted upon him.” So far as we are enabled to see, there is no question of law to be decided, except as to the duty imposed on us; which, it seems to us, is merely that of a jury selected by both parties to perforin a single function.
When Congress, in its wisdom, sees fit to pass an act of such marked beneficence toward an individual, it would ill become this court to try his case in any other than an enlarged and liberal spirit. We have been conscious of no other in the investigation we have made and the results we have reached.
We do not deem it necessary to go into a discussion of the evidence, but will present some brief remarks in relation to the items of the claim urged by the claimant’s counsel.
*729 The libel in the district court proceeded against 4,500 pounds of leaf tobacco, among othe'r things, and the marshal returned that he had seized that quantity. The claimant alleges, however, that, in fact, a very much larger quantity was seized. In his petition to Congress 'he stated the quantity at 122,000 pounds, worth $19,540; in his original petition in this court, sworn to by him, he stated it as 95,000 pounds and the value $14,250; and in his amended petition, also sworn to by him, he put it at 150,000 pounds,' and the value at $37,500. The difference between any one of these amounts and that returned is so extraordinary as to challenge the most careful scrutiny of the court 5 particularly when to find any quantity above 4,500 pounds would stamp the marshal’s return with falsehood; and that, too, in a collateral proceeding to which he is not a party, and in a forum where he does not, and could not, appear to defend his official acts. ,, x
By every rule of law, by every principle of “justice and equity,” the marshal’s return must be received as prima facie "true. The claimant undertook to prove that, in fact, it was not true. After exhaustive examination of the whole evidence bearing on this point, we did not hesitate to hold that not only is not the marshal’s return falsified, but that it is clearly and fully sustained; and on the grounds stated in finding YIÍI, we allow the claimant the value of the 4,500 pounds of leaf tobacco, $675.
In regard to the manufactured tobacco sold under venditioni exponas, as stated in finding VII,'it is found in finding IX that the selling price and market value of it, at the factory, at the time of the seizure, if no internal-revenue tax had to be paid •on it, was $1,147.25; but, if that tax had to be paid, the value was $292.21. Believing it in consonance with the spirit of the act, we allow the.former sum, rather than the latter.
These items of $675 and $1,147.25 cover all the values of personal property seized, so far as values were proved. The value of the other personalty seized, and bonded by, and returned to, the claimant, as stated in finding X, does not appear.
Th,e act authorizes the claimant to recover the loss inflicted upon him by reason of the seizure of -the tobacco factory, its detention, and damage thereto, while under seizure; and in finding XI we fix that at $300, which we consider a fair estimate.
*730 The claimant demands $36,000 for prospective profits on Ms leaf tobacco, which he claims he would have made if he had been allowed to manufacture and sell the tobacco. In reference to this we have only to refer to finding XYI, where it is stated that the profit to be made on tobacco manufactured at the claimant’s factory depended on his being able to sell it in the Indian Territory free from the internal-revenue tax to which such tobacco was then subject by law; and that if that tax had to be paid on it, the manufacture of tobacco there could not have been carried on, either before or after the seizure, without a loss to the claimant. Manifestly, this leaves no basis on which to compute any prospective profits; for it cannot be at all questioned that, after the day of the seizure, the tax would, under the then existing law, certainly have been imposed and demanded by the internal-revenue officers.
The next item of the claim is $6,823, for so many pounds of “a fine quality of manufactured chewing tobacco,” which he avers were wrongfully and unjustly seized by the revenue officers “at Fort Sill, Tahlequah, and Fort Gibson, and in transit from the factory to those places and other points in the Indian Territory.” About the time of the seizure of claimant’s factory quite a number of other lots of tobacco were seized in that Territory, and taken to Yan Burén, Ark., and there libeled in the United States district court, at the same time as that taken from claimant’s factory. Not a pound of all those lots did the claimant set up any claim to in that court. Is it conceivable that while he was there asserting his rights to- the property seized at the factory, he would have stood by absolutely silent as to the rest, if it had been in fact his property? We think not. We had no difficulty in embodying in finding XY our conclusion, that “ it does not appear that any tobacco belonging to the claimant was seized, except that taken from his factory, as set forth in findings IY and Y.”
The next item demanded is $4,109, styled in the brief of counsel “living expenses”; which is explained tornean the greater cost of his living in the city of Washington, at periods between December, 1869, and June, 1880, than he would have incurred if he had lived at his place of residence in Arkansas. The arithmetical process by which that sum is computed is this t Between those, dates Congress was in session 283 weeks; all that time the claimant was in Washington; it cost him $9,081 *731 more to live there in those 283 weeks, at some $5 a day, than it would have cost him to live at home at $3 a week; from that sum deduct $4,972 which he received as clerk of the Committee on Private Land Claims of the House of Eepresentatives, and the balance in-his favor is $4,109.
Whatever proper expenses the claimant incurred in coming to Washington on business connected with said seizure and with the defense of “ The Cherokee Tobacco” Case, we think he should recover. The evidence as to-those expenses is meager and inconclusive; but,-in the exercise of what we regard as a permissible and liberal discretion, we allow him $1,000 on that account.
' Ought he to be reimbursed his expenses of travel and subsistence, incurred after that case was decided, May 1,1871 ? We think not. After that, if he saw fit to go to further expense-in appealing to Congress for relief, such outlay was not a necessary or direct result of the seizure of his factory, but of his voluntary effort to obtain from that body, through mere grace and favor, some relief from the annihilation of his case by the highest judicial tribunal of the land. This is not an expense to-which he was “subjected” by the seizure; and therefore is not a thing that we are required by the terms of the act to allow. The national treasury ought not, we think, “in justice and equity,” to be charged with the subsistence in Washington of a claimant seeking special legislation to relieve him from the consequences of his own violation of law, even though the violation had been committed “ under a misapprehension of his legal rights.”
The next item in the claimant's demand is $2,200 for “traveling expenses.” In regard to this we. need only say that the allowance of $1,000 in finding XII covers liberally, as we think, all such expenses incurred by him in 1870 and 1871, in connection with the seizure and with the defense of “ The Cherokee Tobacco” Case, and that he is “in justice and equity”" entitled to no more.
The only remaining item of his claim, $150 paid to attorneys,, was a necessary expense, and is fairly allowable.
Our verdict, on the facts found, is in favor of the claimant,. as follows:
1. For the value, when seized, of 4,500 pounds of leaf tobacco.. $675 00'
2. For the value, when seized, of the tobacco sold under ven-ditioni exponas... 1,147 36-
*732 3. For the loss, in addition to those two items, inflicted on the claimant by reason of the seizure of his factory, its detention, and damage to it while under seizure. $300 00
4. For expenses incurred. 1,000 00
5. For amount paid attorneys. 150.00
Total. 3,272 25
The judgment of the court is that the claimant recover this total amount.