Peelle, J.,
delivered tbe opinion of tbe court.
Tbis action is prosecuted under tbe Act of July 28, 1892 (27 Stat. L., 320), wbicb reads as follows:
“Whereas it is claimed tbe steamer Eastport was taken by tbe United States anno Domini eighteen hundred and sixty-two, and converted into a gunboat; and
“Whereas it is claimed at tbe time of such taking, one Hugh Worthington, then of Metropolis, Massac County, Illinois, but since deceased, was the owner of three-fifths interest in said steamer, and no compensation has been paid to said Hugh Worthington or his heirs; and
“ Whereas his daughter, Mrs. Sarah A. Oakes, of Metropolis, Illinois, claims that Hugh Worthington was a loyal citizen, that she is his only heir at law, and is justly entitled to receive from the United States compensation for the value of her father’s interest in said steamer: Therefore,
11 Be it enacted by the Senate and Souse of Representatives of the United States of America in Congress assembled, That full jurisdiction is hereby conferred upon the Court of Claims to hear and determine what are the just rights in law of the said Sarah A. Oakes as heir of Hugh Worthington, deceased, and that from any judgments so entered by said Court of Claims either party may appeal to the Supreme Court of the United States for compensation for the value of said Worthington’s interest in said steamer Eastport. That upon proper petition being presented by said Sarah A. Oakes, her heirs, executors, or administrators to said court, said court is authorized and directed to inquire into the merits of said claim, and if on a full hearing the court shall find that said claim is just, the court shall enter judgment in favor of the claimant and against the United States for whatever sum shall be found to be due..
“ Sec. 2. That in case judgment shall be rendered against the United States, the Secretary of the Treasury shall be, and he is hereby, authorized and directed to pay the claimant, her heirs, executors, or administrators whatever sum shall be adjudged by the court to be due out of any money in the Treasury not otherwise appropriated.”
The facts briefly stated are these:
Early in the late civil war the captain of the steamer East-port, plying on the Mississippi and other Western rivers, without the consent or knowledge of the owners, took the vessel from Paducah, the port of her enrollment, to a place on the Tennessee Eiver within the lines of the Confederate forces. What disposition, if any, was made of the vessel by Captain Wood does not appear, but it does appear that soon thereafter the Confederate Government purchased the vessel of someone, *395 as set forth in tbe findings, and that thereafter the vessel was found in the possession of the Confederate forces at Cerro Gordo, on the Tennessee Biver, undergoing transformation into a gunboat for use in the Confederate service.
While the work was thus in progress, but before the vessel had been used in any hostile demonstration against the United States, the naval forces of the United States, under the command of Commodore Foote, captured the vessel' and took her to Mound City, Ill., where she was reconstructed and made a gunboat, and thereafter used as such by the United States until blown up and sunk by her commander in April, 1864, to prevent her capture by the enemy.
The naval forces thus capturing the vessel were at the time under the control of the War Department.
Soon after the capture certain libel proceedings were had against the vessel in the District Court of the United States for the southern district of Illinois, pursuant to the Confiscation Act August 6, 1861 (12 Stat. L., 319), wherein a decree in condemnation forfeiting the vessel to the United States was rendered and the vessel ordered sold at public auction, which was accordingly done by the marshal of the district and the vessel bid in, in the name of the United States, for $10,000, as set forth in the findings.
Of these proceedings Hugh Worthington, one of the owners, had no notice until after the sale and late in 1862.
The act conferring jurisdiction on the court, it will be observed at first reading, is not free from ambiguity.
By the first clause of section 1 jurisdiction is conferred on the court “ to hear and determine what are the just rights in law of the said Sarah A. Oakes as heir of Hugh Worthington, deceased, * * * for compensation for the value of said Worthington’s interest in said steamer Eastport.”
In other words, the act confers jurisdiction on the court to hear and determine in the first instance what the “just rights in law” of Hugh Worthington were at the time of capture or when the vessel was bid in by the United States and taken into the naval service of the Government.
There is no controversy about the claimant being the sole surviving heir of Hugh Worthington, deceased, so that her legal rights, whatever they maybe, will depend upon the “just *396 rights in law” of Hugh Worthington, through whom, as such heir, she claims and from whom her rights emanate.
This being determined in her favor, the second clause of the same section authorizes and directs the court, upon proper petition being presented, “to inquire into the merits of said claim, and if on a full hearing the court shall find that said claim is just, the court shall enter judgment in favor of the claimant and against the United States for whatever sum shall be found to be due.”
The justice of the claim must be measured by the law of the case, i. e., “ the just rights in law ” of Hugh Worthington “ for compensation for the value of said Worthington’s interest in said steamer Eastport.”
The act referred to is a remedial statute, and while, as in the case of the United States v. Cummings (130 U. S., 452), it would operate to remove the bar of any statute of limitations that might exist, no rights are conferred by the act other than remedial that did not exist before; and this is true whether the claimant'or her ancestor, at any time prior to the passage of the act, could have maintained an action in this or any other court.
But the claimant contends that rights other than remedial are conferred by the special act, and in support of this contention several authorities are cited, the first of which is the Fendall Case (16 C. Cls. R., 106). The action in that case was brought under an act of Congress giving this court “original legal and equitable jurisdiction of all claims now existing against tbe District of Columbia arising out of contract.”
That was a general statute for a particular class of claimants, and is otherwise unlike the act in the case at bar; for in addition to the equitable jurisdiction thereby conferred, the cause of action must arise out of contract to entitle a claimant to sue. Jurisdiction was conferred upon the court to inquire into “claims now existing against the District of Columbia arising out of contract,” thus showing that the right of recovery was based on preexisting claims which arose out of contract.
In the Boudinot Case (18 C. Cls. R., 716, 728) a special act was passed to enable an Indian, who claimed protection by reason of a treaty, “ to bring suit in the Court of Claims against the United States Government to recover what may be due *397 Mm in justice and equity for the loss inflicted upon Mm by reason of said seizure, for an alleged violation of the internal-revenue laws, of his property, á tobacco factory, its detention and damages thereto while under' seizure, the value of the tobacco, material, and other personal property also seized, and the expenses to which he was subjected thereby.
That was a case in which no rights existed prior to the passage of the act. The act created a claim arising out of an alleged tort, after the act of the internal-revenue officers had been sustained by a decree of a United States District Court, affirmed by the Supreme Court; and it authorized the claimant to recover, not what was legally due him, but “to recover what may be dire him in justice and equity for the loss inflicted upon him” by the seizure, notwithstanding the legality of the seizure had been sustained by the courts.
So that there is no parallel between that case and the one at bar, for in the case at bar rights did exist, subject to the character of the recapture of the vessel and the legality of the condemnation proceedings, both of which the court is authorized to judicially inquire into, to ascertain the “just rights in law” of the claimant and her ancestor.
In the Carroll Case (22 C. Cls. R., 104-107) a special act of Congress conferred jurisdiction on the court to enable the persons therein stated to maintain an action against the District of Columbia “ to recover such damages, if any, as they have sustained by reason of the change of grade and the regrading of the streets around square No. 736 in the city of Washington, * * * and, in ascertaining the damages sustained by the plaintiffs, the court is directed to take into consideration the advantages, if any, to the said square No. 736 resulting from the change of grade and regrading aforesaid.”
The court in construing this act said:
“The doctrine is indisputable that a municipal corporation is not liable to adjoining property owners in damages for consequences incident to an improvement of the street so long as there is no encroachment upon the possession of the owner and the corporation is guilty of no negligence; but Congress in the passage of the act of our jurisdiction have waived that defense on the part of the District of Columbia, and referred to this court the question of the extent of the injury, if any, suffered by the claimants in the improvement of the streets of the city of Washington as the owner of block No. 736, known as Duding-ton Square.”
*398 A cursory reading of tbe act will convince any one that by it certain rights were conferred on the claimants, i. e., “to recover such damages, if any, as they have sustained by reason of the change of grade and the regrading of the streets,” etc., thereby conferring rights that did not exist before; an din addition to this the court was directed, in the ascertainment of the damages sustained, “to take into consideration the advantages, if any, to the said square numbered seven hundred and thirty-six resulting from the change of grade and regrading aforesaid.”
The act not only conferred jurisdiction on the court to enable persons to maintain their actions, but it took away an important defense and substituted in its stead a right of recovery for such damages as they may have sustained resulting from the change of grade and regrading as therein stated.
In the case at bar there is no contention that any defense is taken away from the defendants by tbe act.
In the case of the United States v. Alexander (148 U. S., 186) the question did not arise. That was an action by the owner of a well which became dry by reason of the construction of an aqueduct to increase the water supply in the city of Washington. The first section of the act provided among other things in substance that a survey and map should be made of the lands necessary to extend the aqueduct and the mode of acquiring title to such lands by condemnation, and then the section provided that “ any person or corporation having any estate or interest in any of the lands embraced in said survey and map, who * * * shall be directly injured in any property right, may, at any time within one year from the publication of notice by the Attorney-G-eneral, as above provided, file a- petition in the Court of Claims of the Uuited States^ setting forth his right or title and the amount claimed by him as damages for the property taken or injury sustained.”
The question presented in that case was as to whether the act restricted “ the right to sue exclusively to the parties holding land within the limits of the survey.”
The court held that “ the plain meaning and intent of the legislature were to provide for the care of those whose lands or property rights were directly injured by the construction of the work proposed to be done, as well as for the care of those injured by the taking of their lands.”
*399 So the destruction of the well was held to be a “ direct injury ” to property recognized as such by law, and that, inasmuch as the injury resulted from “ the construction of a public work under authority of a statute,” there could be a recovery both on principle and authority.
The foregoing are the authorities cited by the claimant in support of the proposition that the act under which suit is brought is not only remedial, but fixes the rights of the claimant, or gives her rights additional to those she had theretofore, i. e., that the act merely devolves upon the court the duty of ascertaining the facts, and then, without reference to the legal rights of the parties at the time of the capture or sale of the vessel, to proceed to assess the damages, thereby constituting the court a jury shorn of judicial discretion.
Congress doubtless have the power to create a claim or cause of action, at least as against the United States, and by the same act to provide a remedy for its enforcement, but they have not done so, in our opinion, in the remedial act under consideration.
By the act jurisdiction is conferred on the court to hear and determine “the just rights in law” of the claimant, not simply as to heirship, but in addition the “just rights in law” of Hugh Worthington, deceased, “for the value of said Worth-ington’s interest in said steamer Eastport.”
It is indeed true that a subsequent clause of the first section directs the court to inquire into the merits of the claim, and if it “shall find that said claim is just,” it is directed to enter judgment “for whatever sum shall be found to be due.”
But this is plainly governed by the preceding -or jurisdictional clause, “that full jurisdiction is hereby conferred upon the Court of Claims to hear and determine what are the just rights in law” of the claimant as heir of the original owner; and when the statute subsequently says that the court shall enter judgment if it be found “ that said claim is just,” it means just “in law” as previously prescribed. The rights to be determined are legal rights.
With these preliminary remarks concerning the proper construction to be given to the act we will proceed to consider what “the just rights in law” of Hugh Worthington were “for compensation for the value of said Worthington’s interest in said steamer Eastport.”
*400 The claimant’s contention is that the vessel was captured by the Confederate forces, but before she had been used or was in condition to use in any hostile demonstration against the United States she was recaptured by the naval forces of the United States; and that inasmuch as the claimant was a loyal citizen of the United States, residing at the time in a loyal State (Illinois), the title as between him and the United States was not divested by reason of such recapture; and that the condemnation proceedings in the District Court of the United States for the southern district of Illinois under the Confiscation Act August 6, 1861 (12 Stat. L., 319), and the sale of the vessel under the decree of the court thereunder, were void for the want of an order of the President to seize and condemn the vessel, as held in the case of the United States v. Winchester (99 U. S., 372), and that the whole proceedings are, therefore, reviewable collaterally in this proceeding.
For these reasons, and to sustain a recovery, the claimant invokes the doctrine of thejws postliminii of the Roman law, which she contends was recognized in the Act March 3, 1800, section 1 (2 Stat L., 17), the first section of which is as follows:
“ That when any vessel other than, a vessel of war or privateer, or when any goods which shall hereafter be taken as prize by any vessel, acting under authority from the Government of the United States, shall appear to have before belonged to any person or persons, resident within or under the protection of the United States, and to have been taken by an enemy of the United States, or under authority, or pretence of authority, from any prince, government, or state, against which the United States have authorized, or shall authorize, defence or reprisals, such vessels or goods not having been condemned as prize by competent authority before the recapture thereof, the same shall be restored to the former owner or owners thereof, he or they paying for and in lieu of salvage, if retaken by a public vessel of the United States, one-eighth part, and if retaken by a private vessel of the United States, one-sixth part, of the true value of the vessel or goods so to be restored, allowing and excepting all imposts and public duties to which the same may be liable. And if the vessel so retaken shall appear to have been set forth and armed as a vessel of war, before such capture or afterwards, and before the retaking thereof as aforesaid, the former owner or owners, on the restoration thereof, shall be adjudged to pay for and in lieu of salvage one moiety of the true value of such vessel of war or privateer.”
*401 The Act June 30, 1864, section 29 (13 Stat. L., 314), now Revised Statutes, section 4652, incorporated the essential provisions of the act 1800, repealing, however, the specific rate of salvage therein fixed and providing that the sum to be paid as salvage cost and expenses should be fixed by the court in the event of a judgment of restitution.
The defendant’s contention is, assuming that the vessel was captured by the Confederate forces, that her recapture by the naval forces of the United States, while under control of the War Department, was a recapture by the Army of the United States, and that by reason thereof the claimant’s title was thereby divested and became vested in the United States.
And the defendants further contend that the proceedings in the District Court, as before stated, were in conformity to law, and that if the title did not become vested in the United States by reason of the capture aforesaid, then the same did vest by reason of the sale had under the decree of condemnation.
The question for our consideration at this point, then, assuming, as the claimant contends, that the yessel was captured by the Confederate forces, is as to the character of the recapture by the naval'forces of the United States on inland waters while under the control of the War Department.
The question is one by no means free from embarrassment, and, as far as we have been able to investigate, we have found no adjudicated case directly in point, and none has been cited by counsel on either side.
It is well settled and not questioned in this case that if the vessel in controversy was captured by the Army the title thereto passed as soon as the capture was complete; while if captured by the Navy as prize the title would not pass until condemned as provided by law. (Halleck’s International Law, ch. 30, secs. 1 and 2; the ship Resolution, 2 Dall., 1; the Adventure, 8 Cranch, 221; the Sally Magee, 3 Wall., 451; the Peterhoff, Blatchford, R., 620; the Neustra, etc., 108 U. S., 92.)
It will not be necessary to consider the question of a joint capture by the Army and Navy, as the findings show that the recapture, if such it was, was by the officers and men of vessels in the Navy under the control of the War Department, so that the army and the naval forces within the territory or district *402 of tbe captured vessel were necessarily acting under tbe orders of tbe same military commander.
Therefore if the recapture is to be treated as a marine capture, by tbe naval forces of tbe United States, such capture was presumably by order of tbe military commander and not under direction of naval or admiralty authority.
It can not therefore be claimed, under tbe circumstances of this case, that tbe capture was made by tbe naval forces as such acting under naval authority, as evidently contemplated should be done in order to dignify tbe capture as a marine prize of war. (See Case 680 Pieces Merchandise, 2 Sprague, 233, 235.)
To sustain a recovery herein tbe vessel must have been “taken as prize” within tbemeauing of tbe Act of 1800 (supra). That war existed at tbe time there is no controversy.
In tbe Case 269 1-2 Bales of Cotton (1 Woolworth, 236-256) tbe court, by Mr. Justice Miller, in speaking of tbe capture of cotton on tbe 26th of September, 1862, by vessels used as transports on tbe Mississippi Biver, said :
“ From that statement it is not at all inferable that tbe vessels named were any part of tbe naval force of tbe United States. Indeed, we know that no naval force then existed on those waters. The gunboats were made a part of tbe Navy by order of tbe Government on tbe 1st day of October, several days after tbe capture.”
And further along at page 257 it is said:
“In short, tbe entire statements consistent with tbe fact that tbe vessels and crews were in tbe employment of the War Department, and were used merely as transports to carry tbe troops; and it is consistent with no other supposition.”
Thus showing that in tbe mind at least of that great jurist, to constitute a maritime prize tbe capture must have been by tbe naval forces as such, acting under naval authority, and that inasmuch as tbe naval vessels on tbe Western or inland ' waters of tbe United States were not made a part of tbe Navy until October 1, 1862, no such capture could have occurred prior thereto.
Tbe Act July 16, 1862 (12 Stat. L., 587), under which tbe, capturing and other vessels were transferred to tbe Navy Department recited and provided “ that tbe Western gunboat fleet constructed by tbe War Department shall be transferred *403 to tbe Navy Department, which shall be hereafter charged with the expense of its repair, support, and maintenance/ thus showing that prior to the transfer the capturing vessels had been constructed by the War Department, and by reference to the Army Appropriation Act July 17, 1861 (12 Stat. L., 263), we find that the sum of $1,000,000 was appropriated for “ gunboats on the Western waters.” Of this all persons were bound to take notice.
The findings (5) show that the vessel was captured from the enemy by detachments of men from the gunboats Tyler, Lexington, and Conestoga while she was lying under the banks of the river being converted into a gunboat for use in the Confederate service.
It is evident, therefore, that the vessel at the time of capture was accessible to the land forces, and as was said in the Cotton Plant Case (10 Wall., 577, 580), “ there was nothing in the situation of the property that required peculiarly a naval force or marine service to effect its capture. The seizure might as well have been made by a detachment from the Army as by one from the Navy.”
In this same connection the court in the case of Porter v. United States (106 U. S., 607, 612), in construing the words “inland waters,” as used in the Act July 2, 1864, section 7 (13 Stat. L., 377), said:
“The term ‘inland’ as here used was evidently intended to apply to all waters of the United States upon which a naval force could go, other than bays and harbors on the seacoast. In most instances property of the enemy on them could be taken, if at all, by an armed force without the aid of vessels of war. These were seldom required on such waters, except when batteries or fortified places near them were to be attacked in conjunction with the Army.”
This authority, however, is not cited for the purpose of showing that no marine capture could have occurred on the inland waters of the United States at the time of the recapture of the vessel in the case at bar, but rather as showing the intention of Congress by the act, as thus construed, that captures of enemies’ property on the inland waters could be effected “if at all, by an armed force without the aid of vessels of war.”
If the land forces had aided in the recapture, it is clear that they would have done so under the order of the same military commander, as both forces were subject to his orders.
*404 While the land forces did not contribute immediately to the recapture of the vessel, they were at the time stationed at or near the mouth of the Tennessee Hi ver.
At the same time it is quite evident, from the facts of the case, that the land forces could have captured the vessel without the cooperation of the naval forces, in which case it is conceded the title would have become vested in the United States.
So, in view of what we have said, and the reasoning of the authorities cited, we hold that the vessel was captured by the Army, and that therefore the title of the claimant’s intestate thereby became divested and vested in the United States.
This being the holding of the court it is unnecessary to consider the question of the legality of the condemnation proceedings in the District Court for the southern district of Illinois; or the other, perhaps more important, question as to whether the captured vessel, which was undergoing conversion into a gunboat for use in the Confederate service, would fall within the meaning of the Act of 1800 (supra), “as a vessel of war” as set forth in the first clause of the section quoted.
In view of the conclusion we have reached in the case, it is unnecessary to consider what may be the “just rights in law ” of the claimant in the estate as “heir,” or the legal effect of the statute in that regard authorizing her to bring this suit.
For the reasons stated the claimant is not entitled to recover, and the petition is therefore dismissed..
Weldon and Davis, J. J., were not present when this case was tried, and took no part in the decision.