Matthew M. Levy, J.
In its complaint, the plaintiff alleges that it is a “ State Enterprise of the Republic of Turkey and as such is an integral part of the Government of the Republic of Turkey ’ \ Its duties, among other things, 11 are to develop in the Republic of Turkey the meat and fish industry and to supply the public and army with meat and fish for their consumption ’ ’. The defendant B. N. S. International Sales Corporation and the defendant Fidelity & Casualty Company of New York are domestic corporations. The plaintiff pleads a contract between it and the defendant B. N. S., a copy of which is annexed to the complaint, and which in essence provides for the purchase by the plaintiff from defendant B. N. S. of a quantity of mutton and further provides for payment to the defendant B. N. S. of dollar credits owing to the Republic of Turkey by various oil companies doing business in that country. Because of difficulty in arranging the exchange of currency for this transaction, the original contract was, by mutual agreement, subsequently modified to reduce the quantity of mutton to be supplied, to extend the period of time for shipment and to reduce the total purchase price. The plaintiff *300 further alleges that the defendant B. N. S. obtained from the defendant Fidelity & Casualty Company of New York, a performance bond in accordance with the contract as amended. The plaintiff also alleges the payment to the account of defendant B. N. S. by Esso Standard (Turkey) Inc., upon authorization of the plaintiff and the defendant B. N. S., of $120,000, and the alleged failure of the defendant B. N. S. to make shipment of mutton in accordance with the modified contract. In consequence, the plaintiff sues to recover the said sum of $120,000. A second cause of action is alleged against B. N. S. on the grounds of unjust enrichment for $120,000. The third cause of action is on the performance bond.
In their answer the defendants B. N. S. and Fidelity “ admit that plaintiff is a State enterprise of the Republic of Turkey and as such an integral part of the Government of the Republic of Turkey.” The defendants also admit the execution of the written agreement annexed to the complaint, but deny the claimed modification thereof. The defendant B. N. S. asserts a counterclaim against the plaintiff, charging in substance that the plaintiff breached the contract by failing to supply certain required documents. As a result thereof, the defendant B. N. S. contends that it sustained damage in the amount of $500,000. Judgment is demanded by the defendants dismissing the complaint, and the defendant B. N. S. demands judgment on its counterclaim for $380,000 — computed by deducting the payment of $120,000 from the $500,000 damages allegedly sustained.
The plaintiff served a reply to the counterclaim, denying the material allegations thereof and setting forth two affirmative defenses. The first affirmative defense is partial in character and the plaintiff therein realleges that it is a “ State Enterprise of the Republic of Turkey and an integral part ’ ’ of that government and, as such, “ is a sovereign power entitled to all the rights and immunities of sovereignty”. By reason thereof, the plaintiff pleads that any counterclaim asserted against the plaintiff is limited to a setoff against any amount which the plaintiff might ultimately prove as against the counterclaiming defendant. The second affirmative defense is pleaded as a complete defense, in which the plaintiff alleges that it is immune from suit in the courts of this State without its consent, that it may not, without the plaintiff’s permission, be the subject of any counterclaim asserted by the defendant B. N. S. in its answer, and that the plaintiff has not permitted or consented to the assertion of a counterclaim against it, nor has it waived its sovereign immunity in that respect. The defendant B. N. S. now moves for an order, pursuant to rule *301 111 of the Rules of Civil Practice, to strike the defenses — whether partial or complete — interposed by the plaintiff to the counterclaim upon the ground that such defenses are insufficient in law upon the face thereof.
In consonance with the principle of comity among nations, foreign sovereigns have been given immunity from suit in our courts (1 Hyde, International Law [2d Rev. ed., 1945], § 244) ; and it has long been established that a sovereign cannot be sued here without his consent (Schooner Exchange v. McFaddon, 7 Cranch [11 U. S.] 116; The Roseric, 254 F. 154). Primarily, however, the claim by a foreign sovereign of immunity from suit is a political rather than a judicial matter. The determination of the Federal executive as to whether or not immunity exists in respect of any given foreign power or agency thereof is conclusive upon the courts. The issue, if raised, may be decided in the judicial sphere only where the matter has not been settled as a political question. (Stone Eng. Co. v. Petroleos Mexicanos, 352 Pa. 12; Miller v. Ferrocarrill del Pacifico de Nicaragua, 137 Me. 251; Neto York & Cuba Mail S. S. Co. v. Republic of Korea, 132 F. Supp. 684.) It is to be noted at the outset that, as far as appears from the pleadings in the instant case, no executive action as to the forensic status of the present plaintiff has been taken by the Department of State of the United States. In such circumstances I feel free to determine the matter in the exercise of judicial responsibility.
The plaintiff here is not the Republic of Turkey. The plaintiff is not a sovereign state. It titles itself, as indicated, as a “ State Enterprise of the Republic of Turkey ”, The plaintiff asserts that it is, as such, a sovereign power entitled to all the rights and immunities of sovereignty. As a general rule, an agency wholly or partly owned or controlled by a foreign government is not entitled to the immunity of the government. (Hannes v. Kingdom of Roumania Monopolies Inst., 260 App. Div. 189, motion for leave to appeal or for rearg. denied 260 App. Div. 1006; Amtorg Trading Corp. v. United States, 71 F. 2d 524; Coale v. Societe Co-op. Suisse des Charbons, 21 F. 2d 180; Ulen & Co. v. Bank Gospodarstwa Krajowego, 261 App. Div. 1, motion for leave to appeal denied 261 App. Div. 838.) But where the corporation functions as. a public agency or instrumentality or where evidence of corporate separateness from the government was not strong, immunity has been granted. (Bradford v. Director General of Railroads of Mexico, 278 S. W. 251 [Tex.]; Dunlap v. Banco Central del Ecuador, 41 N. Y. S. 2d 650; Stone Eng. Co. v. Petroleos Mexicanos, 352 Pa. 12, supra.) Therefore, although a determination of the *302 exact status of the plaintiff would seemingly be in order, an inquiry in that regard is not here necessary, for the defendant, in its answer, has admitted that the plaintiff is a State enterprise and as such is an integral part of the government of the Republic of Turkey. And, for the purpose of this decision, it will be assumed that the assertion of immunity by this plaintiff’s attorneys is being made by a duly authorized agent of the Turkish government, for this court would presumptively have jurisdiction unless the government of the Republic of Turkey itself objects (see Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc., 32 F. 2d 195, cert, denied 280 U. S. 579).
One of the basic issues, then, involved on this motion is whether the plaintiff comes within the “ sovereign immunity” rule, in view of the nature of the tranaction sued upon by the plaintiff and counterclaimed upon by the defendant. Another issue is whether, by the commencement of this suit on its own behalf, and thus voluntarily invoking this court’s jurisdiction, the plaintiff should be deemed to have waived any immunity from suit (which it may have asserted) and to have consented to the determination of the issues raised by the defendant’s direct counterclaim.
Immunity has been historically granted so that a State may discharge its governmental functions without undue interference (see Block, Suits Against Government Officers and the Sovereign Immunity Doctrine, 59 Harv. L. Rev. 1060, 1062-1063). But ownership and operation of commercial undertakings are not traditional acts of sovereignty per se, and the injustice arising from enforcing a claim of sovereign immunity when the lawsuit is grounded upon a commercial transaction has led to criticism. For example, the comment by William Harvey Reeves (chairman of the Committee on Sovereign Immunity of the International Bar Association) in his article, “ Good Fences and Good Neighbors: Restraints on Immunity of Sovereigns ” (44 A. B. A. J. 521, 524) is pointed and, in my opinion, quite sound: ‘‘ Foreign sovereigns appearing as litigants in our courts have generally been accorded immunity, if desired, but there has been a growing feeling that the foreign sovereign which, acting through its official agents, comes to the United States, buys and sells, borrows and does other commercial acts, no different from those which can be and normally are performed by private corporations, corporations which could be either of that sovereign’s country or of the country with whose business men the foreign sovereign is dealing, should not be accorded immunity. There is really no authority for any broad proposition that, at all times and- at all places *303 and under all circumstances, in the United States a friendly sovereign and its property have immunity, although at times it seems it has been so badly interpreted that one would believe that this was considered to be its meaning.”
In certain instances, immunity has been mutually waived by treaty.* When the matter has not thus been politically resolved, the recognized injustice adverted to has given rise to a distinction, sometimes relied upon by the courts, between acts jure imperii, acts of sovereignty, and thus exempted from jurisdiction, and acts jure gestionis, acts of private law, and, therefore, within the jurisdiction of the local courts (National Bank v. Republic of China, 348 U. S. 356; Hannes v. Kingdom of Roumania Monopolies Institute, 260 App. Div. 189, motion for leave to appeal or for rearg. denied, 260 App. Div. 1006, supra).
In my view, the privileged position of a sovereign is one of policy, and as such it should not be applied in matters wholly of a commercial nature serving not the traditional purposes of government, but rather its proprietary enterprises through entities which need not necessarily be regarded as basic departments of government. And this thesis I would support, even though governments have more and more deemed it essential and proper to extend their functions in aid of their own needy populations or of the ill-fed, ill-clothed, and ill-housed peoples of other lands. In this context, I hold that the purchase of meat for importation and supply to the Turkish army or for resale to the citizens of the Republic of Turkey does not necessarily constitute a 81 public act ’ ’ in the sense that the performance of such an act is, in its entirety a time-honored function of government to which the ancient rule of sovereign immunity should be applied in a modern society.
WThile remaining as much as politically requisite within the fundamental ambit of the “ immunity ” doctrine, the courts have, in seeking a just disposition of these controversies, consistently endeavored to apply equitable principles. The clear trend of judicial pronouncements is that in any case when a sovereign chooses to engage in commercial ventures outside *304 the historical area of governmental functions, the corporate or separate entity through which the sovereign acts should be held liable for its contractual obligations (see United States v. Deutsches Kalisyndikat Gesellschaft, 31 F. 2d 199, and Coale v. Societe Co-op. Suisse des Charbons, 21 F. 2d 180, supra). The evolution away from the absolute doctrine of immunity as expressed in the Schooner Exchange case (7 Cranch [11 U. S.] 116, supra) has been substantially broadened, as was necessitated by the changing conditions of the political-and commercial world.
I shall now consider another facet in the case at bar which bears heavily upon the issue as to whether the assertion of immunity here is a valid one — and that is whether there has been a waiver of the right to interpose such a claim. A sovereign can, of course, waive immunity expressly, as when it consents, by governmental treaty or private contract, to be sued, or by requesting to be made a party defendant or by making an appearance to answer the complaint (Richardson v. Fajardo Sugar Co., 241 U. S. 44). Admittedly, there is no such consent in this case.
However, it has been held that consent may also be implied. Such implication may be said to arise because the sovereign has become an entrepreneur. Professor Bishop, in his valuable volume entitled International Law, Cases and Materials (1953), refers (p. 431) to the “ well-documented study ” of Dr. E. W. Allen on “ The Position of Foreign States before National Courts, Chiefly in Continental Europe ”, published in 1933, wherein two lines of judicial opinion regarding implied renunciation as a waiver of immunity are noted — “ one, very conservative, followed by the United States, Great Britain, Germany, Czechoslovakia, Hungary, and perhaps Holland, the other less static, more influenced by the development of the economic activities of the modern state, espoused by the courts of many other states. * * * [T]he swing toward the more radical doctrine of holding states responsible to the courts for their economic activities was.given a great impetus by the appearance on the international stage of the Union of Soviet Socialist Republics. Courts that had never before assumed jurisdiction over an unwilling foreign state tore aside the veil and saw beneath the garments of the sovereign a powerful economic competitor of national business firms, which should not be allowed- to handicap private enterprise by the claim of sovereign prerogative.”
It may be that some of our domestic courts have hesitated to spell out an “ implied waiver ” of immunity from the fact *305 alone that the sovereign has entered into a commercial contract. On the other hand, I am of the view that no legal fiction need be invoked when a sovereign comes into and uses our courts to prosecute the claims it asserts have arisen by virtue of such business transaction. In such case, it seems to me, there is a definitive, litigious act, voluntarily undertaken, which may justly give the court a fair, positive ground upon which to base a holding that any objection to the court proceeding with the litigation to its just conclusion has been waived (Republic of China v. American Express Co., 195 F. 2d 230). More recent decisions of the courts rest upon the principle that, when a sovereign sues to enforce a claim, “it so far takes the position of a private suitor as to agree by implication that justice may be done with regard to the subject matter ” (United States v. The Thekla, 266 U. S. 328, 339-340; Republic of China v. American Express Co., 195 F. 2d 230, supra; see, also, French Republic v. Inland Nav. Co., 263 F. 410; Kingdom of Roumania v. Guaranty Trust Co., 250 F. 341, cert. denied 246 U. S. 663).
True, the early and majority of these cases dealt with admiralty controversies, but, through the years, these decisions have been extended to the broader field of commercial transactions generally (see 36 Harv. L. Rev. 871). It now appears to be well settled that a counterclaim arising out of the same transaction will be permitted, at least as a defensive weapon in the form of a setoff. Moreover, the “waiver of immunity” rule has also recently been expanded to include any plea which could be a basis for a counterclaim against a private person or corporation, and, if found to be valid, apply as an offset to defeat the sovereign’s claim — even though the counterclaim did not arise out of the same transaction as gave rise to the sovereign’s suit (National Bank v. Republic of China, 348 U. S. 356, supra). Writing for the majority of the Supreme Court of the United States, Mr. Justice Frankfurter said (pp. 361-362): “The short of the matter is that we are not dealing with an attempt to bring a recognized foreign government into one of our courts as a defendant and subject it to the rule of law to which nongovernmental obligors must bow. We have a foreign government invoking our law but resisting a claim against it which fairly would curtail its recovery. It wants our law, like any other litigant, but it wants our law free from the claims of justice.” The court points out (p. 359) that the granting of sovereign immunity may, in many situations, create injustice and hardship and is not now favored.
The remaining problem to be considered is whether or not such a counterclaim must be limited to the amount which the *306 foreign sovereign is entitled to recover in its suit against the counterclaiming defendant, or whether an affirmative judgment can be entered against the sovereign in favor of the defendant. As both parties have relied rather heavily on the opinion of the United States Supreme Court in the Republic of China case (348 U. S. 356, supra), a brief summary of the facts and procedures in that case is in order. China brought suit against the National City Bank to recover deposits of $200,000 which the bank refused to allow the government of China to withdraw. In answer, the bank set up counterclaims for $1,634,432 based on two defaulted issues of China’s Treasury Notes held by the bank. The counterclaims were rejected by the District Court because they were not based upon the subject matter of the transaction on which suit was instituted by China (108 F. Supp. 766). The Court of Appeals affirmed (208 F. 2d 627). The bank thereupon relinquished its demand for affirmative relief, and, on certiorari, the judgment was reversed by the Supreme Court (348 U. S. 356). Since the bank abandoned all claim to affirmative relief, the sole question ultimately decided was whether claims based on matters extrinsic to the issue projected by the complaining sovereign could be applied as a setoff. The United States Supreme Court ruled in the affirmative. I am of the opinion, therefore, that the final holding in that case is not definitively dispositive of the present problem.
Now; let us take a look at some other precedents, whether cited by counsel or not. Generally, counterclaims have been allowed to the extent only of the amount for which the sovereign has brought suit, and there are a number of cases which hold that affirmative relief against a sovereign cannot be pleaded or obtained (see, for example, United States v. Shaw, 309 U. S. 495; The Siren, 7 Wallace [74 U. S.] 152; Matter of Patterson-MacDonald Shipbuilding Co., McLean v. Commonwealth of Australia, 293 F. 192, cert, denied 264 U. S. 582). But there are a number of cases, more or less recent, where “ affirmative judgment ’ ’ has been granted. In Republic of Haiti v. Plesch (190 Misc. 407) a counterclaim was entertained which sought an adjudication of title to the precise property (securities) which was the subject matter of the sovereign’s action, even though the sovereign would thereby be deprived of property (see, also, Irish Free State v. Guaranty Safe Dep. Co., 127 Misc. 86). In granting a lien against the sovereign’s ship, the recovery of which was sought in United States of Mexico v. Rash (118 Cal. App. 21) the court said (p. 31): “ He [counsel for Mexico, the appellant] virtually contends that a friendly foreign sover *307 eign can walk in the doors of onr courts and by the. process of our laws take what it desires, walk out of the doors at will, and close them upon any further consideration of the case and any adjudication of the rights of the sovereign and the citizens of this country whom the sovereign has named as its adversary.” In an earlier case (The Nuestra Senora de Regla, 108 U. S. 92) an affirmative judgment against a sovereign was upheld, as it was in another and later case (The Paquete Hobana, 189 U. S. 453).
In these cases, relief, it is true, was nonmonetary, but the subject property was considered beyond normal judicial reach. Also, while the majority of these cases concern the application of the law of admiralty — where there was a comparatively early broadening of recognized judicial jurisdiction in many countries in those suits where a vessel was involved or they concerned matters of similar import — a reading of the relevant precedents shows the judicial thought based on equitable principles. (See “ Competence of Courts in Regard to Foreign States ”, Research by Harvard Law School in International Law, Philip C. Jessup, Reporter, Am. J. Int. L., vol. 26 Supp. [1932], pp. 451, 527 ff.) And although the Republic of China case (348 U. S. 356, supra) is not in point, the language and reasoning of the court are not without some value in aid of a determination of the problem now before me. For it is a recent iteration by our supreme Federal tribunal of the ‘1 fair play ’ ’ that our courts seek to obtain in these matters, assuming no overriding national diplomatic policy to the contrary (Ex Parte Peru, 318 U. S. 578, 588-589). I conceive that the “ fair play ” desired is doubly indicated when, as in the case at bar, (a) the foreign agency is the initial suitor, and (b) the defendant’s counterclaim — although beyond that of a setoff — arises out of the very transaction sued upon by the plaintiff.
It may be urged that an affirmative judgment against a foreign sovereign should not be permitted to be sought by a domestic litigant because such a judgment cannot be collected and thus the court may be placed in the embarrassing position of issuing an unenforeible decree. I would not be impressed with such, a contention, were it presented. It is not unusual for a court — once having jurisdiction — to entertain a suit even though the judicial result cannot be mandated. Fqr example, a judgment may be rendered against an impecunious debtor, custody of a child may be awarded to a parent although the child is not within the jurisdiction, a specific performance may be decreed notwithstanding that the defendant is no longer amenable to punishment for disobedience. Many other instances *308 may readily (but I take it need not) be given in respect of private suitors.
Coming to the situation where sovereigns are before the court, a judgment may be obtained, for example, against the State of New York under the Court of Claims Act, but execution cannot be levied against the property of the sovereign, and, unless the State voluntarily appropriates funds for the payment of the judgment, the successful claimant is without remedy. A case arose where our Federal Government was involved as a litigant in United States v. The Thekla (266 U. S. 328, supra). There, the Supreme Court of the United States held that (p. 341) “ [t]he question of damages to the colliding vessel necessarily arose and it is reasonable for the Court to proceed to the determination of all the questions legitimately involved, even when it results in a judgment for damages against the United States.”
As to a foreign State, the distinction between the rendition of an affirmative judgment and its enforcement was recognized in the case entitled The Gloria (286 F. 188). Nevertheless, the court said (p. 193): “ It would seem only proper that the court determine all issues fairly before it, even though it involve a finding that the plaintiff state was indebted to the defendant. A modern court should strive to do complete justice; a partial and incomplete adjudication tends only to protract and complicate litigation to the detriment of all concerned.” Although the holding in this case has been disputed (see Matter of Patterson-MacDonald Shipbuilding Co., McLean v. Commonwealth of Australia, 293 F. 192, cert, denied 264 U. S. 582), I believe it to be the correct view. That belief is given support by the more recent case of Dexter & Carpenter, Inc., v. Kunglig Jarnvagsstyrelsen (43 F. 2d 705, cert. denied 282 U. S. 896) where “ the Boyal Administration of the Swedish State Bail-ways ” — “ in no way a distinct entity from the Swedish government ” (43 F. 2d 706) — sued for damages resulting from a breach of contract for the sale of coal. An answer was filed, including a counterclaim in which the appellant sought affirmative relief by way of damages for breach of contract for the purchase of the coal. Becovery on the counterclaim was upheld, although the court stated (43 F. 2d 708, 710) that “ consenting to be sued does not give consent to a seizure or attachment of the property of a sovereign government. # * * Whatever may be appellant’s remedy to collect its valid judgment, it should not be necessary to resort to further litigation. It is *309 hoped that the judgment of our courts will be respected and payment made by the Swedish government. ’ ’
To conclude: I hold that, in the circumstances of this case, the defenses — by which the plaintiff has sought to assert immunity from the counterclaim interposed by the defendant, not only by way of setoff but also by way of additional recovery — are insufficient in law and should be stricken. In thus disposing of this matter, I need not now pass upon what is not before me. Let me, therefore, recapitulate, in capsule form, what the present record discloses: The plaintiff here is a business agency of a foreign power — not the sovereign itself. The plaintiff affirmatively invoked the jurisdiction of the court — it did not engage in litigation here as a defensive act against legal proceedings commenced by the defendant. The plaintiff’s suit is upon a business contract with a domestic corporation — not one based upon an intergovernmental compact. The transaction was one which any individual or company may enter into — not one which must necessarily have been engaged in by a governmental power or agency. The counterclaim interposed by the defendant is based upon the very transaction sued upon by the plaintiff — not an indirect claim grounded upon an extrinsic situation. It does not appear that the disallowance of the claim of immunity will give rise to any diplomatic issues as between the foreign sovereign and our own Government — no proof of any Federal executive representations in the premises has been presented.

 Thus, in Treaty of Friendship, Commerce and Navigation between the United States of America and the Italian Republic, signed February 2, 1948 (art. XXIV, par. 6) it is provided that “ [n]o enterprise of either High Contracting Party which is publicly owned or controlled shall, if it engages in commercial, manufacturing, processing, shipping or other business activities within the territories of the other High Contracting Party, claim or enjoy, either for itself or for its property, immunity therein from taxation, from suit, from execution of judgment, or from any other liability to which a privately owned and controlled enterprise is subject therein ”, (63 U. S. Stat. [1949], Part 2, Treaties, p. 2292).