**VICTORY TRANSPORT INCORPORAT- ED, owner of the S.S. HUDSON, Petitioner-Appellee,**

v.

**COMISARIA GENERAL de ABASTECI- MIENTOS y TRANSPORTES, voyage charterer of the S.S. Hudson, Respond- ent-Appellant.**

No. 338, Docket 28636.

United States Court of Appeals Second Circuit.

Argued March 10, 1964.

Decided Sept. 9, 1964.

Charles L. Trowbridge, New York City (Herbert M. Lord and Burlingham, Underwood, Barron, Wright & White, New York City, on the brief), for petitioner-appellee.

Edwin S. Shapiro, New York City (Harry Wallach, New York City, on the brief), for respondent-appellant.

Before SMITH, KAUFMAN and MARSHALL, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

This is an appeal from an order of the United States District Court for the Southern District of New York, Thomas F. Murphy, District Judge, granting appellee's motion to compel arbitration and denying appellant's cross

motions to vacate service and dismiss the petition. We think the district court's disposition of the motions correct and affirm the order.

■ The appellant, a branch of the Spanish Ministry of Commerce, voyage-chartered the S.S. Hudson from its owner, the appellee, to transport a cargo of surplus wheat, purchased pursuant to the Agricultural Trade Development and Assistance Act, 7 U.S.C. § 1691 et seq.,[1] from Mobile, Alabama to one or two safe Spanish ports. The charter agreement contained the New York Produce Arbi-

tration Clause, providing for the arbitration of disputes before three commercial men in New York.[2] The ship was delayed and sustained hull damage in discharging its cargo in Spanish ports that were allegedly unsafe for a ship of the Hudson's size. When the appellant failed to pay for the damages or submit the dispute to arbitration, the appellee instituted this proceeding under Section 4 of the United States Arbitration Act, 9 U.S.C. § 4,[3] to compel arbitration. On March 22, 1963, appellee secured an ex parte order from the district court

1. This statute is designed to use surplus agricultural commodities to expand international trade and to further the foreign policy of the United States. It provides a means for the sale of such commodities through private trade channels to governments of friendly nations for foreign currencies. In negotiating agreements for the sale of surplus agricultural commodities to foreign countries the President is directed by § 1701(b) to "take appropriate steps to assure that private trade channels are used to the maximum extent practicable * * *." On May 22, 1961, Spain and the United States entered into an Agricultural Commodities Agreement which permitted purchasers authorized by the Government of Spain to buy various amounts of surplus commodities, including $14.4 million worth of wheat, by depositing pesetas to the account of the United States.

2. "Should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men."

3. 9 U.S.C. § 4.
"A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any court of the United States which, save for such agreement, would have jurisdiction under the judicial code at law, in equity, or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. Five

days' notice in writing of such application shall be served upon the party in default. Service thereof shall be made in the manner provided by law for the service of summons in the jurisdiction in which the proceeding is brought. The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed. If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue. Where such an issue is raised, the party alleged to be in default may, except in cases of admiralty, on or before the return day of the notice of application, demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury in the manner provided by law for referring to a jury issues in an equity action, or may specially call a jury for that purpose. If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed. If the jury find that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof."

permitting service of its petition by registered mail at appellant's Madrid office. Service pursuant to this order was effected on April 1, 1963.[4]

On October 15, 1963 the appellant moved to vacate the extraterritorial service as unauthorized by statute. Appearing specially and supported by an affidavit of the Spanish Consul, who stated that the appellant was a branch of the Spanish Government and immune from suit, counsel for the appellant also moved to dismiss the petition to compel arbitration because of a lack of jurisdiction and sovereign immunity. Rejecting these cross-motions, Judge Murphy held that the court had *in personam* jurisdiction and granted the appellee's motion to compel arbitration.

## SOVEREIGN IMMUNITY

Appellant's primary contention is that as an arm of the soverign Government of Spain, it cannot be sued in the courts of the United States without its consent, which it declines to accord in this case. There is certainly a great deal of impressive precedent to support this contention, for the doctrine of the immunity of foreign sovereigns from the jurisdiction of our courts was early entrenched in our law by Chief Justice Marshall's historic decision in The Schooner Exchange v. McFaddon, 7 Cranch 116, 3 L.Ed. 287 (U.S. 1812). The doctrine originated in an era of personal sovereignty, when kings could theoretically do no wrong and when the

exercise of authority by one sovereign over another indicated hostility or superiority. With the passing of that era, sovereign immunity has been retained by the courts chiefly to avoid possible embarrassment to those responsible for the conduct of the nation's foreign relations. See Comment, The Jurisdictional Immunity of Foreign Sovereigns, 63 YALE L.J. 1148 (1954). However, because of the dramatic changes in the nature and functioning of sovereigns, particularly in the last half century, the wisdom of retaining the doctrine has been cogently questioned. See, *e. g.*, Lauterpacht, The Problem of Jurisdictional Immunities of Foreign States, 28 BRIT. Y. B. INT'L L. 220 (1951). Growing concern for individual rights and public morality, coupled with the increasing entry of governments into what had previously been regarded as private pursuits, has led a substantial number of nations to abandon the absolute theory of sovereign immunity in favor of a restrictive theory. See Dralle v. Rep. of Czechoslovakia, 17 Int.L.Rep. 155 (Sup. Ct. of Austria 1950); SUCHARITKUL, STATE IMMUNITIES AND TRADING ACTIVITIES IN INTERNATIONAL LAW (1959); Lauterpacht, *supra*.

Meeting in Brussels in 1926, representatives of twenty nations, including all the major powers except the United States and Russia, signed a convention limiting sovereign immunity in the area of maritime commerce to ships and cargoes employed exclusively for public and non-commercial purposes.[5] After World

---

4. To make doubly sure that the appellant had been properly served, the appellee, on October 22, 1963, sought to take advantage of the recent amendment to Rule 4(i) of the Fed. Rules of Civil Procedure by re-serving the appellant by registered mail without a court order. Since we deem the initial service valid, we need not pass on the validity of the second service.

5. International Convention for the Unification of Certain Rules Concerning the Immunities of State Ships. The French text of the Convention is set out in HARVARD RESEARCH IN INTERNATIONAL LAW, 426–429 (1931). An English translation prepared by the Department of State may be found in ALLEN, THE POSI-

TION OF FOREIGN STATES BEFORE NATIONAL COURTS, 303–308 (1933).
Article I of the Convention provided:
"Seagoing vessels owned or operated by States, cargoes owned by them, and cargoes and passengers carried on Government vessels, and the States owning or operating such vessels, or owning such cargoes, are subject in respect of claims relating to the operation of such vessels or the carriage of such cargoes, to the same rules of liability and to the same obligations as those applicable to private vessels, cargoes, and equipments."
Article II provided that these liabilities and obligations may be enforced by the same rules and procedure applied to pri-

358

War II the United States began to restrict immunity by negotiating treaties obligating each contracting party to waive its sovereign immunity for state-controlled enterprises engaged in business activities within the territory of the other party. Fourteen such treaties were negotiated by our State Department in the decade 1948 to 1958. Setser, The Immunity Waiver for State-Controlled Business Enterprises in United States Commercial Treaties, Proceedings of Am.Soc.Int'l L. 89 (1961). And in 1952 our State Department, in a widely publicized letter from Acting Legal Adviser Jack B. Tate to the Acting Attorney General Philip B. Perlman, announced that the Department would generally adhere to the restrictive theory of sovereign immunity, recognizing immunity for a foreign state's public or sovereign acts (*jure imperii*) but denying immunity to a foreign state's private or commercial acts (*jure gestionis*). 26 Dept. State Bull. 984 (1952).

■ In delineating the scope of a doctrine designed to avert possible embarrassment to the conduct of our foreign relations, the courts have quite naturally deferred to the policy pronouncements of the State Department. National City Bank of New York v. Republic of China, 348 U.S. 356, 360–361, 75 S.Ct. 423, 99 L.Ed. 389 (1955). See generally, Cardozo, Judicial Deference to State Department Suggestions: Recognition of Prerogative or Abdication to Usurper, 48 CORN.L.Q. 461 (1963). The Supreme Court's dictum in Republic of Mexico v. Hoffman, 324 U.S. 30, 35, 65 S.Ct. 530, 533, 89 L.Ed. 729 (1945)—"It is therefore not for the courts to deny an immunity which our government has seen fit to allow, or to allow an immunity on new grounds which the government has

not seen fit to recognize"—has been variously construed,[6] but we think it means at least that the courts should deny immunity where the State Department has indicated, either directly or indirectly, that immunity need not be accorded. It makes no sense for the courts to deny a litigant his day in court and to permit the disregard of legal obligations to avoid embarrassing the State Department if that agency indicates it will not be embarrassed. Cf. National City Bank v. Republic of China, *supra*, 348 U.S. at 360–361, 75 S.Ct. 423 (1955). Moreover, "recognition by the courts of an immunity upon principles which the political department of government has not sanctioned may be equally embarrassing to it in securing the protection of our national interests and their recognition by other nations." Republic of Mexico v. Hoffman, *supra*, 324 U.S. at 36, 65 S.Ct. at 533.

■ This is not to say that the courts will never grant immunity unless the State Department specifically requests it. A claim of sovereign immunity may be presented to the court by either of two procedures. The foreign sovereign may request its claim of immunity be recognized by the State Department, which will normally present its suggestion to the court through the Attorney General or some law officer acting under his direction. Alternatively, the accredited and recognized representative of the foreign sovereign may present the claim of sovereign immunity directly to the court. Ex parte Muir, 254 U.S. 522, 41 S.Ct. 185, 65 L.Ed. 383 (1921). In some situations the State Department may find it expedient to make no response to a request for immunity. Where, as here,[7] the court has received no communication from the State Department

vate ships and cargoes, while Article III excepted from the application of the first articles "ships of war, Government yachts, patrol vessels, hospital ships, auxiliary vessels, supply ships, and other craft owned or operated by a State and used at the time a cause of action arises exclusively on Governmental and noncommercial service * * *" However,

Article III did provide for certain remedies before the courts of the sovereign owning or operating a vessel as a public activity.

6. See Comment, *supra*, 63 YALE L.J. at 1157–1159.

7. The plea of sovereign immunity for the Comisaría General in the district court

concerning the immunity of the Comisaria General, the court must decide for itself whether it is the established policy of the State Department to recognize claims of immunity of this type. Republic of Mexico v. Hoffman, *supra,* 324 U.S. at 36, 65 S.Ct. 530.

Through the "Tate letter" the State Department has made it clear that its policy is to decline immunity to friendly foreign sovereigns in suits arising from private or commercial activity. But the "Tate letter" offers no guide-lines or criteria for differentiating between a sovereign's private and public acts. Nor have the courts or commentators suggested any satisfactory test. Some have looked to the nature of the transaction, categorizing as sovereign acts only activity which could not be performed by individuals.[8] While this criterion is relatively easy to apply, it ofttimes produces rather astonishing results, such as the holdings of some European courts that purchases of bullets or shoes for the army, the erection of fortifications for defense, or the rental of a house for an embassy, are private acts. See ALLEN, The Position of Foreign States Before National Courts 31 (1933) and cases cited therein. Furthermore, this test merely postpones the difficulty, for particular contracts in some instances may be made only by states.[9] Others have looked to the purpose of the transaction, categorizing as *jure imperii* all activities in which the object of performance is public in character.[10] But this test is even more unsatisfactory, for conceptually the modern sovereign always acts for a public purpose. Lauterpacht, *supra,* 28 BRIT. Y. B. INT'L L. at 224. Functionally the criterion is purely arbitrary and necessarily involves the court in projecting personal notions about the proper realm of state functioning. See Lalive, *supra,* fn. 9, 3 RECUEIL DES COURS at 260 (1953). See also, Friedmann, The Growth of State Control Over the Individual and Its Effect Upon the Rules of International State Responsibility, 19 BRIT. Y. B. INT'L L. 118, 128 (1938); Setser, The

was supported only by a conclusionary affidavit of the Spanish Consul in New York. A consul is supposedly clothed with authority to act for his government only in commercial matters. Since nothing in the record indicates that the Spanish Consul was specially authorized to interpose a claim of sovereign immunity, the affidavit was plainly insufficient. The Sao Vicente, 260 U.S. 151, 43 S.Ct. 15, 67 L.Ed. 179 (1922); The Anne, 16 U.S. 435, 3 Wheat. 435, 4 L.Ed. 428 (1818); The Secundus, 13 F.2d 469 (E.D.N.Y. 1926); Harris & Co. Adv. Inc. v. Republic of Cuba, 127 So.2d 687 (D.C.App.Fla. 1961).

On appeal the Spanish Ambassador to the United States has written a letter directly to this court claiming immunity for the Comisaría General and has moved for permission to appear specially in the proceeding. We find it unnecessary to decide whether this procedure is sufficient to raise the claim of sovereign immunity or whether the defense has been waived through a failure to present it properly. Under the view we take of sovereign immunity, permitting the Spanish Ambassador to intervene at this stage in the proceedings will not materially prejudice the appellee, who does not dispute appellant's sovereign status. We therefore grant the motion of the Spanish Ambassador and treat the claim of sovereign immunity as properly presented to the court.

8. Weiss, *Compétence ou l'incompétence des tribunaux à l'égard des États étrangers*, RECUEIL DES COURS, 525 (Hague Academy of Int'l L. 1923); De Paepe, *De la compétence civile a l'égard des États étrangers et de leurs agents politiques, diplomatiques ou consulaires*, 22 *Journal du droit international* 31, 33 (Clunet 1895); Draft Convention on the Competence of Courts in Regard to Foreign States, HARVARD LAW SCHOOL RESEARCH IN INTERNATIONAL LAW, 386–391 (1931).

9. Lauterpacht, *supra,* 28 BRIT. Y. B. INT'L L. at 225; Lalive, *L'immunité de juridiction des États et des Organisations Internationales*, 3 RECUEIL DES COURS 205, 259–260 (Hague Academy of Int'l Law 1953). For example, any individual may be able to purchase a boat, but only a sovereign may be able to purchase a battleship. Should the purchase of a yacht be equated with the purchase of a battleship?

10. See Fensterwald, *Sovereign Immunity and Soviet State Trading*, 63 HARV. L.R. 614, 621 (1950); SUCHARITKUL, *supra,* at 168–169.

**360**

Immunities of the State and Government Activities, 24 LAW & CONT. PROBS. 291, 309 (1959).

■ ■ The conceptual difficulties involved in formulating a satisfactory method of differentiating between acts *jure imperii* and acts *jure gestionis* have led many commentators to declare that the distinction is unworkable.[11] However, the Supreme Court has made it plain that when the State Department has been silent on the question of immunity in a particular case, it is the court's duty to determine for itself whether the foreign sovereign is entitled to immunity "in conformity to the principles accepted by the department of the government charged with the conduct of foreign relations." Republic of Mexico v. Hoffman, *supra*, 324 U.S. at 35, 65 S. Ct. at 532. And since the State Department has publicly pronounced its adherence to the distinction, we must apply it to the facts of this case.

■ ■ The purpose of the restrictive theory of sovereign immunity is to try to accommodate the interest of individuals doing business with foreign governments in having their legal rights determined by the courts, with the interest of foreign governments in being free to perform certain political acts without undergoing the embarrassment or hindrance of defending the propriety of such acts before foreign courts. Sovereign immunity is a derogation from the normal exercise of jurisdiction by the courts and should be accorded only in clear cases. Since the State Department's failure or refusal to suggest immunity is significant,[12] we are disposed to deny a claim of sovereign immunity that has not

been "recognized and allowed" by the State Department unless it is plain that the activity in question falls within one of the categories of strictly political or public acts about which sovereigns have traditionally been quite sensitive.[13] Such acts are generally limited to the following categories:

(1) internal administrative acts, such as expulsion of an alien.

(2) legislative acts, such as nationalization.

(3) acts concerning the armed forces.

(4) acts concerning diplomatic activity.

(5) public loans.[14]

We do not think that the restrictive theory adopted by the State Department requires sacrificing the interests of private litigants to international comity in other than these limited categories. Should diplomacy require enlargement of these categories, the State Department can file a suggestion of immunity with the court. Should diplomacy require contraction of these categories, the State Department can issue a new or clarifying policy pronouncement.

■ The Comisaría General's chartering of the appellee's ship to transport a purchase of wheat is not a strictly public or political act. Indeed, it partakes far more of the character of a private commercial act than a public or political act. The charter party has all the earmarks of a typical commercial transaction. It was executed for the Comisaría General by "El Jefe del Servicio Commercial," the head of its commercial division. The wheat was consigned to and shipped by a

---

11. *E.g.*, Lauterpacht, *supra*, 28 BRIT. Y. B. INT'L L. at 225–226; Fitzmaurice, State Immunity from Proceedings in Foreign Courts, 14 BRIT. Y. B. INT'L L. 101, 123–124 (1933); Comment, *supra*, 63 YALE L.J. at 1161–1162.

12. National City Bank v. Republic of China, *supra*, 348 U.S. at 360, 75 S.Ct. 423; Compania Espanola de Navegacion Maritima, S.A. v. The Navemar, 303 U.S. 68, 75, 58 S.Ct. 432, 82 L.Ed. 667 (1938).

13. In New York and Cuba Mail S.S. Co. v. Republic of Korea, 132 F.Supp. 684, 685 (S.D.N.Y.1955), the State Department declined to suggest immunity because the act in question was not "purely governmental in character."

14. Lalive, *supra*, 3 RECUEIL DES COURS at 285–286.

private commercial concern. And one of the most significant indicators of the private commercial nature of this charter is the inclusion of the arbitration clause. The French Court of Appeal, in dismissing a claim of sovereign immunity where the governmental charterer h'ad agreed to arbitration, pointed out:

> "A contract relating to maritime transport is a private contract where the owner merely puts his ship and the ship's crew at the disposal of the State and does not take a direct part in the performance of the public service undertaken by the State in the latter's capacity as a charterer. The charter party does not contain any clause peculiar to public law or unusual in private law. It provides for a time charter of the vessel which is put at the disposal of the State chartering it. The insertion of the arbitration clause underlines the intention of the parties to make their agreement subject to private law."

Myrtoon Steamship Company v. Agent Judicaire Du Tresor, 24 Int.L. Rep. 205, 206 (1957).

Maritime transport has been included among the commercial or business activities specifically mentioned in recent United States treaties restricting sovereign immunity.[15] And the 1926 Brussels Convention, the first major international attempt to restrict sovereign immunity, which Spain signed but never ratified, denied immunity to all maritime governmental activities except vessels operated exclusively on non-commercial service, such as warships, patrol vessels, or hospital ships.[16]

Even if we take a broader view of the transaction to encompass the purchase of wheat pursuant to the Surplus Agricultural Commodities Agreement to help feed the people of Spain, the activity of the Comisaría General remains more in the commercial than political realm. Appellant does not claim that the wheat will be used for the public services of Spain; presumptively the wheat will be resold to Spanish nationals. Whether the Comisaría General loses money or makes a profit on the sale, this purchasing activity has been conducted through private channels of trade. Except for United States financing, permitting payment in pesetas, the Comisaría General acted much like any private purchaser of wheat.

Our conclusion that the Comisaría General's activity is more properly labelled an act *jure gestionis* than *jure imperii* is supported by the practice of those countries which have adopted the restrictive theory of sovereign immunity. Thus the Commercial Tribunal of Alexandria declined to grant immunity to this same Spanish instrumentality in a more difficult case—a suit arising from the Comisaría's purchase of rice to help feed the people of neutral Spain during wartime.

> "It is not contended in the present case that the rice in question was bought by the *Comisaria General* for the needs of the Spanish public services. On the contrary, it seems clearly established that the rice was bought for the feeding of the Spanish population during a difficult period. In negotiating this purchase herself, instead of leaving the matter to private enterprise, Spain proceeded in much the same manner as any other Spanish trader would have done who wanted to buy rice in Egypt; that is to say, she got it out of Egypt with the necessary permits and carried it to Spain in a

---

15. A typical provision is contained in Article XVIII (Par. 3) of the FCN Treaty with Israel, signed August 23, 1951:
    "No enterprise of either Party, including corporations, associations, and government agencies and instrumentalities, which is publicly owned or controlled shall, if it engages in commercial, manufacturing, processing, shipping or other business activities within the territories of the other Party, claim or enjoy, either for itself or for its property, immunity therein from taxation, suit, execution of judgment or other liability to which privately owned and controlled enterprises are subject therein." Quoted in Setser, 1961 Proceedings of Am. Soc. Int'l L. at 90.

16. See fn. 5, supra.

Spanish ship in order to re-sell it on the usual commercial lines. This being so, the *Comisaria General* cannot claim immunity from jurisdiction, and the judgment entered against it must be confirmed.[17]

Though there are a few inconsistencies,[18] the courts in those countries which have adopted the restrictive theory have generally considered purchasing activity by a state instrumentality, particularly for resale to nationals, as commercial or private activity.[19]

Finally, our conclusion that the Comisaría General's claim of sovereign immunity should be denied finds support in the State Department's communication to the court in New York and Cuba Mail S. S. Co. v. Republic of Korea, 132 F.Supp. 684, 685 (S.D.N.Y.1955). There the Republic of Korea was allegedly responsible for damaging a ship while assisting in the unloading of a cargo of rice for distribution without charge to its civilian and military personnel during the Korean War. Though suggesting that Korea's property was immune from attachment, the State Department refused to suggest immunity "inasmuch as the particular acts out of which the cause of action arose are not shown to be of a purely governmental character." If the wartime transportation of rice to civilian and military personnel is not an act *jure imperii, a fortiori* the peacetime transportation of wheat for presumptive resale is not an act *jure imperii.*[20]

## THE ACT OF STATE DOCTRINE

■■ The appellant also seeks to enter the sanctuary of sovereign immunity through the side door by urging that since the acts complained of occurred in Spanish ports, which were designated as safe by a branch of the Spanish Government, the act of state doctrine prohibits holding the Spanish Government to account for the propriety of those acts. As most recently formulated by the Supreme

17. Egyptian Delta Rice Mills Co. v. Comisaría General de Madrid, 55 Bulletin de législation et le jurisprudence egyptiénnes, 114 (1942–3), quoted in Lauterpacht, supra, 28 BRIT.Y.B.INT'L L. at 255.

18. Takhowsky v. Gouvernement federal suisse et Regnier, 48 Journal du droit international 179 (Clunet) (Court of Appeal, Paris 1921) (holding that Switzerland was entitled to immunity in a suit arising from its charter of ships to transport cocoa for the Swiss chocolate industry during World War I because the venture was not exclusively commercial) ; Etienne v. Gouvernement neerlandais, Dalloz 84 (1948), Annual Digest, Case No. 30 (Tribunal Commercial de la Rochelle 1947) (holding that a ship requisitioned and operated by the Dutch Government to transport wheat for the reprovisioning of the Netherlands was a political rather than a commercial act). But these are decisions of courts of France where it is difficult to tell to what extent the restrictive theory of sovereign immunity has been adopted. The French decisions are uncertain and often contradictory. Compare Hamson, Immunity of Foreign States, The Practice of the French Courts, 27 BRIT.Y.B.INT'L L. 293 (1950), concluding that the French courts have departed very little from the classical theory of immunity so far as the foreign State itself is concerned, with Lauterpacht supra, 28 BRIT.Y.B. INT'L L. at 260, concluding that France can no longer be included among countries adhering to the absolute theory of immunity.

19. E.g., Monnoyer et Bernard v. Etat Francaise, 3 Pasierisie Belge 129 (1927) ; Etat roumain v. Pascalet et Cie., Dalloz 260 (1924) ; Stato di Romania c. Trutta, I Monitore dei Tribunali 288 (1926), Annual Digest 179 (1925–26) ; Societe pour la fabrication des cartouches c. Col M., Ministre de la Guerre de Bulgarie, Belgique Judiciare 383 (1889) ; Et Ve Balik Kurumu v. B. N. S. Internat'l Sales Corp., 25 Misc.2d 299, 204 N.Y.S.2d 971 (Sup.Ct.1960), aff'd 17 A.D.2d 927, 233 N.Y.S.2d 1013 (A.D.1962) ; Pacific Molasses Co. v. Comite de Ventas de Mieles, 30 Misc.2d 560, 219 N.Y.S.2d 1018 (Sup.Ct.1961). See generally, Sucharitkul, supra, at 322, 324.

20. Since in our view sovereign immunity does not apply, we find it unnecessary to consider whether the agreement to arbitrate constituted an implied waiver of sovereign immunity. Compare Duff Development Company, Ltd. v. Government of Kelantan, L.R. [1924] A.C. 797 with Ben Aiad c. Gouvernement tunisien, Dalloz 305 (Cour de Cassation 1897).

Court, the act of state doctrine "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401, 84 S.Ct. 923, 926, 11 L.Ed.2d 804 (1964). The difficulty with appellant's argument is threefold. First of all, the act of state doctrine applies only to the "public acts" of a foreign sovereign, Restatement Foreign Relations Law of U. S., § 41c (Proposed Official Draft 1962), and we cannot see that designating ports as safe for the S.S. Hudson was a public act of the Spanish Government. The designation of safe ports for the discharge of cargo is an act frequently performed by merchants voyage-chartering a cargo ship. See Gilmore and Black, THE LAW OF ADMIRALTY 179–181 (1957). It can hardly be termed an act of state simply because a state instrumentality happened to be the voyage-charterer. Moreover, designation of the ports as safe was not an act performed within the territory of Spain, nor was it performed by the Government of Spain. Here the designation of the actual discharge ports was done on the bill of lading by the appellant's shipper at Mobile, Alabama. Appellant's act of state argument is therefore considerably wide of the mark.

## JURISDICTION

Though in most cases jurisdiction over a foreign sovereign is obtained in an *in rem* proceeding, there is no bar to the assertion of *in personam* jurisdiction. See Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, 300 F. 891 (S.D.N. Y. 1924) (L. Hand, J.), aff'd 32 F.2d 195 (2 Cir. 1929). Relying on the panel decision in Petrol Shipping Corporation v. Kingdom of Greece, 326 F.2d 117 (2 Cir. 1964), appellant contends that there is here no basis for the district court's assumption of *in personam* jurisdiction. In Petrol Shipping Corp. v. Kingdom of Greece, a case factually similar to this one, the majority of the panel held only that Greece could raise the defense of sovereign immunity by a letter from its ambassador sent directly to the court. The full court, sitting *in banc*, altered the panel decision, vacated the district court's judgment dismissing the petition to compel arbitration, and remanded for further proceedings. 332 F.2d 370 (2 Cir. 1964).

We hold that the district court had *in personam* jurisdiction to enter the order compelling arbitration. By agreeing to arbitrate in New York, where the United States Arbitration Act makes such agreements specifically enforceable, the Comisaría General must be deemed to have consented to the jurisdiction of the court that could compel the arbitration proceeding in New York. To hold otherwise would be to render the arbitration clause a nullity. In Farr & Co. v. Cia. Intercontinental De Navegacion, 243 F. 2d 342 (2 Cir. 1957) and Orion Shipping & Trading Co. v. Eastern States Petro. Corp. of Panama, 284 F.2d 419 (2 Cir. 1960), this court held that § 4 of the United States Arbitration Act provides sufficient jurisdictional basis for the district court to order a foreign corporation which had agreed to arbitration in New York to submit to arbitration. Unless the arbitration clause in this charter differs significantly from the arbitration clauses specifically enforced in the Farr and Orion cases, it is clear that the court has *in personam* jurisdiction, for we see no reason to treat a commercial branch of a foreign sovereign differently from a foreign corporation. The arbitration clause construed in Farr provided: "This submission may be made a rule of court by either party." The corresponding language in the arbitration clause in the instant case provides: "[F]or the purpose of enforcing any award, this agreement may be made a rule of the Court." Appellant argues that this slight difference in wording requires a different result, for the appellee is seeking appointment of an arbitrator, not enforcement of an award. We cannot agree. This fine distinction did not trouble this court in Orion, where the corresponding language of the arbitration clause provided: "For the purpose

of enforcing awards this agreement shall be made a Rule of the Court." Implicit in the agreement to arbitrate is consent to enforcement of that agreement.

The suggestion by the appellant that the subject matter of the controversy is without the admiralty jurisdiction of the United States courts is utterly devoid of merit. It has long been settled that a charter-party is a maritime contract and that disputes arising therefrom are within the admiralty jurisdiction of the United States courts. Morewood v. Enequist, 23 How. 491, 64 U.S. 491, 16 L.Ed. 516 (1860).

SERVICE OF PROCESS

■ The appellant has also challenged the propriety of the extraterritorial service employed here. But since the appellant as consented beforehand to the jurisdiction of the district court, the sole function of process in this case was, as Judge Murphy correctly noted below, to notify the appellant that proceedings had commenced. This function was certainly performed. Moreover, similar service of process on nongovernmental foreign corporations was held sufficient in the Farr and Orion cases, supra. No rule of international law requires special treatment for serving branches of foreign sovereigns. See SUCHARITKUL, supra, at 350, 351.

Section 4 of the Arbitration Act provides that service of the petition to compel arbitration shall be made in the manner provided by the Federal Rules of Civil Procedure. The language of Rule 4(d) (3), incorporated by reference into Rule 4(d) (7), which permits service in the manner employed in the state courts, provides for service on "a domestic or foreign corporation or upon a partnership or other unincorporated association which is subject to suit under a common name" and would seem broad enough to cover the Comisaría General. Moreover, Rule 4(e) provided, as of March 22, 1963, that:

"Whenever a statute of the United States or an order of court provides for service of a summons, or of a notice, or of an order in lieu of a summons upon a party not an inhabitant of or found within the state, service shall be made under the circumstances and in the manner prescribed by the statute, rule, or order."

Since the appellant had consented to the jurisdiction of the court, Judge Dawson's order authorizing service by registered mail did not violate due process. And since service was effected pursuant to Judge Dawson's order, such service complied with the terms of Rule 4(e).

The order of the district court is affirmed.