# Suspension of the Foreign Sovereign Immunities Act in Litigation Involving Iranian Assets

It is doubtful that the International Emergency Economic Powers Act can be utilized to override conflicting provisions of a comprehensive and specific federal statute such as the Foreign Sovereign Immunities Act, particularly where such action is not demonstrably necessary to dealing with the underlying national emergency.

July 22, 1980

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

We have been asked to address the question whether the President has the authority under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701 (Supp. I 1977), to suspend the Foreign Sovereign Immunities Act of 1976 in litigation now pending against Iran. We assume that this action would effectively bar Iran from asserting a sovereign immunity defense both as to attachment and on the merits. The complete suspension of the Immunities Act would include provisions providing procedures for obtaining jurisdiction and related matters, such as service, *e.g.,* 28 U.S.C. §§ 1330, 1608, which presumably ought to be left in place if the litigation is to proceed. Moreover, since, prior to the Immunities Act, there was absolute immunity from execution against a foreign sovereign,[1] we assume that the provisions of the Act permitting the possibility of execution would remain.

We first analyze IEEPA to see if the power to affect sovereign immunity is a possible use of its power and then discuss its relationship to the Immunities Act. The IEEPA, as we have discussed previously,[2] provides very broad power for the President in dealing with property in which any foreign country has an interest during a national emergency. 50 U.S.C. § 1702(a)(1)(B). The emergency declared on November 14, 1979, with respect to Iran (Exec. Order 12,170, 3 C.F.R. 457 (1979)) is sufficient to invoke these powers as to Iranian property blocked by that order. Under the statute, the President may "regulate, . . . nullify, void, prevent or prohibit, . . . exercising any right, power, or privilege with respect to . . . any property in which any foreign

---

[1] *See* Kahale & Vega, *Immunity and Jurisdiction: Toward a Uniform Body of Law in Actions Against Foreign States,* 18 Colum. J. Transnat'l L. 211, 217 (1979).

[2] *See, e.g.,* Memorandum Opinion for the Attorney General, June 25, 1980 ["Presidential Power To Regulate Domestic Litigation Involving Iranian Assets," p. 236, *supra*].

country has any interest, . . . with respect to any property, subject to the jurisdiction of the United States."

In determining the intent of Congress, we began with the literal meaning of the words employed to provide a threshold determination. *United States* v. *Yoshida International, Inc.*, 526 F.2d 560, 573 (C.C.P.A. 1975) (upholding import surcharge under Trading with the Enemy Act). The literal language would permit the President to prohibit the Iranian government from exercising the right or privilege of invoking sovereign immunity in any lawsuit where its property subject to U.S. jurisdiction, *i.e.*, blocked assets, is concerned. There is no indication that IEEPA or its predecessor, the Trading with the Enemy Act, have ever been used for this purpose nor is there any evidence that this use was anticipated when the IEEPA was passed.[3] This, by itself, would not be fatal since IEEPA is an emergency statute and one does not expect, from its very nature, that Congress will anticipate all of the ways in which it will be used. *Id.* at 573, 576, 578.

Moreover, the crucial language in IEEPA was taken from the Trading with the Enemy Act, 50 U.S.C. App. § 5(b). There is a long history under the former of the Act being used in the broadest manner which its language would bear. Its use over the years shows its expansion as a result of continuing interplay between the Executive and Congress. *See* "Emergency Power under § 5(b) of the Trading with the Enemy Act" in S. Rep. 549, 93d Cong., 1st Sess. 184 (1973); 42 Op. Att'y Gen. 363 (1968) (upholding Foreign Direct Investment Program); Letter from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel, to the General Counsel, Department of Commerce, Sept. 29, 1976 (validity of export controls), reprinted in International Trade Reporter's U.S. Export Weekly, Oct. 19, 1976, No. 128 ("1976 OLC Letter"); *Cf. United States* v. *Yoshida International, supra,* collecting cases at note 16. Although enactment of IEEPA represented a reaction to this use, Congress did not narrow the pertinent language.[4] Instead, it sought to control the use of emergency power through the use of procedural requirements for emergency declarations, 50 U.S.C. § 1701, and imposition of congressional consultation and reporting requirements. 50 U.S.C. § 1703. *See also* National Emergencies Act, 50 U.S.C. § 1601 *et seq.,* which asserts a congressional veto procedure for national emergen-

---

[3] An argument might be made, however, that freezing Iranian funds and then removing immunity is tantamount to seizure. The legislative hsitory of IEEPA shows that seizure was not authorized. *Revision of Trading with the Enemy Act; Markup before the House International Relations Committee,* 95th Cong., 1st Sess. 2, 4, 20 (1977). The differences between the proposal and seizure are sufficient, however, so that we do not think that the legislative history by itself would be determinative. When property is seized, it is taken directly by the government without judicial process. Here the government would not take the property and the courts would make determinations in the usual manner.

[4] Certain changes were made, such as exclusion of wholly domestic transactions from coverage in peacetime, but they are not crucial here. Compare 50 U.S.C. § 1702(a)(1) with 50 U.S.C. App. § 5(b)(1).

245

cies. Thus, if only IEEPA were involved, a persuasive argument could be made that the sovereign immunity defense could be denied Iran.

The more difficult question is whether IEEPA can be used to override the Immunities Act. Prior to its enactment, decisions concerning whether sovereign immunity should apply were made on a case-by-case basis through a quasi-judicial procedure at the State Department. If the State Department decided to grant immunity, it would ask the Justice Department to file a suggestion of immunity with the court in which the action was pending. The suggestion was considered binding on the courts, whether positive or negative. *Victory Transport, Inc.* v. *Comisaria General,* 336 F.2d 354, 358 (2d Cir. 1964), *cert. denied,* 381 U.S. 934 (1965). Political judgments and foreign relations considerations often entered into such decisions and the practice was much criticized for its inherently political nature.[5] As a result, the Executive proposed the Immunities Act to free itself from making *ad hoc* diplomatic decisions in these matters:

> Today, when a foreign state wishes to assert immunity, it will often request the Department of State to make a formal suggestion of immunity to the court. Although the State Department espouses the restrictive principle of immunity, the foreign state may attempt to bring diplomatic influences to bear upon the State Department's determination. A principal purpose of this bill is to transfer the determination of sovereign immunity from the executive branch to the judicial branch, thereby reducing the foreign policy implications of immunity determinations and assuring litigants that these often crucial decisions are made on purely legal grounds and under procedures that insure due process. The Department of State would be freed from pressures from foreign governments to recognize their immunity from suit and from any adverse consequences resulting from an unwillingness of the Department to support that immunity. . . . U.S. immunity practice would conform to the practice in virtually every other country—where sovereign immunity decisions are made exclusively by the courts and not by a foreign affairs agency.

H.R. Rep. No. 1487, 94th Cong., 2d Sess. 7 (1976).[6] Congress also made clear its intention "to preempt any other State or Federal law . . . for according immunity to foreign sovereigns." *Id.* at 12.

---

[5] Kahale & Vega, *supra* note 1 at 216.

[6] In proposing the legislation to the Congress, a joint State-Justice letter noted its broad purpose: "to facilitate and depoliticize litigation against foreign states." 1975 Digest of U.S. Practice in Int'l L. 346. *See also Jurisdiction of U.S. Courts in Suits Against Foreign States, Hearings on H.R. 11315 before the Subcommittee on Administrative Law and Governmental Relations of the House Judiciary Committee,* 94th Cong., 2d Sess. at 26, 27, 29, 34 (1976).

The question thus arises as to whether, having removed immunity decisions from foreign policy considerations in 1976, Congress authorized the President to make exceptions when it passed IEEPA in 1977. Clearly, any emergency statute affects existing rights under other laws. The language of IEEPA, in its reference to regulating and voiding rights and privileges relating to property, recognizes that pre-existing rights arising from other laws will be affected. The Iranian assets freeze, for example, clearly takes precedence over the banking laws and contract law regarding the rights of depositors to withdraw money from banks. A recent case upholding a novel use of the Trading with the Enemy Act stated, "if *every* law applicable to tranquil times were required to be followed in emergencies, there would be no point in delegating emergency powers and no adequate, prompt means for dealing with emergencies." *Yoshida,* 526 72d. at 583. At the same time, the court in *Yoshida* took great pains to show that the 1971 import surcharge was designed so as not to conflict with the specific tariff rates that had been enacted by Congress. *Id.* at 577–78. We know of no case where IEEPA or the Trading with the Enemy Act was used in a situation which brought it into direct conflict with a comprehensive and specific federal statute, such as the Immunities Act. The Trading with the Enemy Act was used on a number of occasions to provide export controls when Congress had allowed export control legislation to expire but there was no legislation forbidding such controls and no indication that Congress, by permitting expiration, opposed such controls. *See* 1976 OLC Letter, *supra.*

For these reasons, it is our judgment that it is quite doubtful that IEEPA can be utilized to override the highly specific provisions of the Immunities Act. In any event, we would question the wisdom of attempting to invoke IEEPA in a case in which it cannot be forcefully maintained that the President's action is, in some important and demonstrable way, necessary to dealing with the underlying emergency. While it might be possible to sustain in court the use of IEEPA if that action were essential to resolving the hostage crisis, it seems to us highly unlikely that we would succeed where the action is at best peripheral to the crisis. The primary implication of an emergency power is that it should be effectively designed to deal with a national emergency. *Lichter* v. *United States,* 334 U.S. 742, 782 (1948). Here, where the assets are already frozen and the Administration has the discretion to seek legislation to seize the assets, it will be difficult to demonstrate the necessity for the attenuated assertion of power.

LARRY A. HAMMOND
*Acting Assistant Attorney General*
*Office of Legal Counsel*
